2014 CO 76

**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Michael Joseph MCKIMMY, Respondent.**

**Supreme Court Case No. 13SC702**

Supreme Court of Colorado.

October 27, 2014

Rehearing Denied November 17, 2014

Attorneys for Petitioner: John W. Suthers, Attorney General, Christine C. Brady, Senior Assistant Attorney General, Denver, Colorado

Attorneys for Respondent: MS & M Law Office, Nicole M. Mooney, Denver, Colorado

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶1 This case requires us to clarify the process for invoking one's rights under the Uniform Mandatory Disposition of Detainers Act ("the UMDDA" or "the Act"), §§ 16–14–101 to –108, C.R.S. (2014). When prisoners strictly comply with the UMDDA's procedural requirements, the Act mandates that they be brought to trial on pending charges within 182 days of their request. §§ 16–14–102(1), 16–14–104(1), C.R.S. (2014). Even when prisoners do not strictly comply with the UMDDA's requirements, we have previously determined that they nevertheless invoke their rights under the Act if (1) their request substantially complies with the Act's requirements, and (2) the prosecution receives "actual notice" of their request. *See People v. Mascarenas*, 666 P.2d 101, 106 (Colo.1983). In this case, the defendant did not strictly comply with the Act; rather, he attempted to invoke his UMDDA rights by mailing multiple letters to the prosecution and the trial court. But, while the prosecution received the defendant's initial requests, it failed to actually become aware of them until well later in the proceedings. We therefore must resolve, as an issue of first impression, whether the prosecution's receipt of such a letter constitutes "actual notice" sufficient to invoke a prisoner's rights under the UMDDA.[1]

¶2 We conclude that it does not. Rather, we hold that, for purposes of substantial compliance under the UMDDA, "actual notice" means "actual knowledge." In this case, because the record is unclear as to precisely when the prosecution gained actual

---

1. Specifically, we granted certiorari to consider: "Whether the court of appeals erred when it ordered the dismissal of four felony convictions based on a misinterpretation of the term 'actual notice' as it applies to the [UMDDA]."

knowledge of the defendant's various UMDDA requests, we cannot determine whether any UMDDA violations occurred. Therefore, we reverse the judgment of the court of appeals and remand with instructions to return the case to the trial court for further fact-finding. Specifically, the trial court should determine: (1) when the prosecution gained actual knowledge of the defendant's UMDDA requests in each of his cases, at which point the defendant would have effectively invoked his rights under the Act; and (2) whether any UMDDA violations subsequently occurred.

## I. Facts and Procedural History

¶ 3 In September 2007, Respondent Michael Joseph McKimmy was arrested for new offenses while on parole and was incarcerated in the Jefferson County Jail. The People charged McKimmy, in two separate cases, with second-degree burglary, theft, identity theft, and a habitual burglary offender count; these cases are numbered 07CR2686 and 07CR3264. In 2008, the People filed complaints against McKimmy in two new cases, including charges for second-degree burglary, theft, identity theft, aggravated motor vehicle theft, and criminal mischief; these cases are numbered 08CR543 and 08CR552.

¶ 4 On November 20, 2007, unbeknownst to his public defender, McKimmy sent a pro-se letter in case 07CR2686 to the Chief Judge of the Jefferson County Court, in which he "formally request[ed] protection under the Uniform Mandatory Disposition of Detainers Act." In the letter's footer, McKimmy wrote, "CC: Deputy District Attorney [Prosecutor Name]." Seven days later, McKimmy sent a similar pro-se letter in case 07CR3264. As for the 2008 cases, on March 5, 2008, McKimmy sent a similar letter in 08CR552; he did the same two days later in 08CR543. Thus, in all four cases, McKimmy sent pro-se letters without his attorney's knowledge to Jefferson County's Chief Judge formally requesting the protections of the UMDDA, and all four letters included a footer purporting to copy the letter to the prosecutor of that particular case.

¶ 5 Neither the trial court nor the prosecution, however, initially became aware of McKimmy's requests in the 2007 cases. The trial court ignored the letters without reading them pursuant to its policy of refusing to acknowledge pro-se letters sent by represented parties, while the prosecution received the 2007 letters but inadvertently misfiled them. Crucially, the record is inconclusive whether the prosecution became immediately aware of the 2008 letters when McKimmy sent them in March 2008.

¶ 6 On February 4, 2008, McKimmy pled not guilty in the 2007 cases, and at a subsequent status conference in March 2008, the trial court discussed potential trial dates with the parties. At this point, McKimmy insisted that he did not wish to waive his "speedy trial rights"; however, he never mentioned the UMDDA specifically. The trial court, under the impression that McKimmy was referring to his rights as defined in section 18–1–405(1), C.R.S. (2014),[2] made certain that the trial dates fell within six months from the date of McKimmy's not-guilty pleas, and it set the trials for July 2008. On May 27, 2008, the process repeated itself for the 2008 cases: McKimmy pled not guilty (rejecting the People's global plea offer for all four cases) and requested that "the Court be certain that we set these [trials] within my speedy trial time frame," at which point the court set the 2008 cases for trial in October 2008. Again, McKimmy made no reference to his UMDDA requests.

¶ 7 Thereafter, McKimmy alleged a conflict of interest with his public defender, and a different trial judge held a conflict hearing in June 2008. During that hearing, McKimmy stated that he had "been trying from day one to assert my speedy trial rights" but that

2. Section 18–1–405 is entitled "Speedy trial." Subsection (1) provides, in pertinent part:

[I]f a defendant is not brought to trial on the issues raised by the complaint, information, or indictment *within six months from the date of the entry of a plea of not guilty,* ... the pending charges shall be dismissed, and the defendant shall not again be indicted, informed against, or committed for the same offense....
(Emphasis added.) In contrast, the UMDDA provides that trial shall be held within 182 days "after the receipt" of the defendant's request for final disposition of untried charges. § 16–14–104(1).

his public defender had refused to file a "motion to dismiss on jurisdictional grounds." When the judge pressed him on the particulars of these jurisdictional grounds, McKimmy said that "I don't want to misspeak or misstate anything," but he reiterated that "it's my belief that my speedy trial rights have been violated already and the time limits [have] expired and there is no jurisdiction." The judge then explained that "[s]peedy trial runs from the time you enter your plea" and that, because six months had not yet elapsed from the date of McKimmy's not-guilty pleas, no speedy trial violation had occurred. Ultimately, the judge found a conflict for other reasons and appointed alternate defense counsel. At no point during this hearing did McKimmy mention the UMDDA.

¶ 8 During July and August 2008,[3] McKimmy appeared before the trial court for numerous status conferences. At one such conference, McKimmy again requested that the trial judge "please help me assert the speedy trial [right] to have [the trials] set in the proper time frame," and the judge responded, "Absolutely.... I try to guard your rights on that ... carefully." Notwithstanding his repeated concerns regarding "speedy trial," McKimmy never mentioned the UMDDA at any of these conferences.

¶ 9 Finally, during a scheduling hearing for all four cases on September 9, 2008, McKimmy invoked the UMDDA by name. Specifically, McKimmy's counsel told the court that McKimmy had recently informed her that he had "a longstanding issue about the propriety of any of these cases going forward due to violation of his speedy trial rights under the Uniform Mandatory Disposition of Detainers Act." McKimmy and the trial judge then engaged in a colloquy, and McKimmy stated that he had previously "filed a formal request for speedy disposition." The trial judge said that such requests were "not in the court file," and she asked the prosecutor if he was familiar with them. The prosecutor responded, "I have a lot of handwritten things from Mr. McKimmy, but I don't be-

lieve he was in [the Department of Corrections]." The trial judge then told McKimmy that if he wished to file a motion regarding the alleged UMDDA violations, he could do so, but only through counsel, as he could not file pro-se motions as a represented defendant.

¶ 10 Thereafter, McKimmy's attorney filed a motion to dismiss all four cases, asserting that the trial court lacked jurisdiction because it had failed to comply with the time limits of the UMDDA. In their response, the People conceded that McKimmy had "substantially complied" with the Act and that they had received "actual notice" of his respective requests, but they argued that McKimmy had impliedly waived his UMDDA rights. On October 15, 2008, the trial court denied the motion from the bench as to the 2008 cases, stating that McKimmy could not "lay traps for the court" and finding that McKimmy's own conduct had pushed the trial dates beyond the UMDDA deadline. The court did not address the 2007 cases in its bench order.

¶ 11 McKimmy then went to trial in the 2008 cases in October 2008, and the jury found him guilty of second-degree burglary, theft, and criminal mischief. In February 2009, the trial judge adopted its ruling from October 2008 and denied McKimmy's motion to dismiss as to the 2007 cases. Trial then proceeded in 07CR2686, and the jury found McKimmy guilty of theft and identity theft. As for 07CR3264, trial was slated to begin on February 18, 2009; on that date, however, McKimmy "became highly agitated [and] fell to the floor hyperventilating and screaming," forcing the court to continue the trial.

¶ 12 McKimmy then discharged his attorney and obtained new alternate defense counsel. In April 2009, his new attorney filed a second motion to dismiss in 07CR3264 (the only case still awaiting trial), alleging that McKimmy had sent letters invoking his UMDDA rights in the 2007 cases to the court and the prosecution in November 2007. At a subsequent hearing, McKimmy's counsel represented to the court that the prosecutor

---

3. Although McKimmy's 2007 cases had originally been set for trial in July 2008, McKimmy agreed to toll his speedy trial rights in those cases in

light of obtaining new counsel, and the trial court temporarily vacated those trial dates.

"doesn't recall seeing" McKimmy's initial letters, so the court allowed him to subpoena the prosecution's case file to determine whether it had in fact received these letters. Two weeks later, the court conducted a substantive hearing on the motion, and McKimmy's counsel confirmed that the 2007 letters were indeed located in the prosecution's file but that they were "stuck in between ... some computer printouts" and had thus been "lost in the shuffle."

¶ 13 In a written order, the trial court denied the second motion to dismiss. In its order, the trial court found that neither the court nor the prosecution became aware of the 2007 letters until McKimmy filed the second motion in April 2009. The trial court further found that, prior to the filing of the second motion, "all of the attorneys and the court were under the impression that the first receipt of a valid UMDDA request from Mr. McKimmy was the request that he filed on March 6, 2008." The trial court then determined that McKimmy had impliedly waived his UMDDA rights, noting that a court cannot enforce a defendant's rights under the Act "if the defendant himself is concealing the information from the court and his own counsel." Thereafter, McKimmy sought to enforce the People's original global plea offer, and the trial court granted his request. McKimmy pled guilty to various charges in all four cases, and the trial court sentenced him to concurrent sentences totaling 24 years.

¶ 14 The following year, McKimmy filed a motion for post-conviction relief in all four cases pursuant to Crim. P. 35(c). The trial court found that the motion "present[ed] virtually the same argument" as the second motion to dismiss. The trial court thus denied the motion, adopting its analysis from its earlier order and stating that McKimmy "cannot continue to bring successive motions based on similar grounds that have already been decided against him."

¶ 15 McKimmy appealed, and the court of appeals reversed. *People v. McKimmy,*

11CA0458, slip op. at 1, 2013 WL 3680044 (Colo.App. July 3, 2013) (unpublished). First, the court of appeals refused to consider the People's argument that the prosecution lacked actual notice of McKimmy's initial UMDDA requests. *Id.* at 11. Instead, the court of appeals cited the People's response to McKimmy's first motion to dismiss, in which the People conceded that they had received "actual notice." *Id.* It concluded that this concession constituted a binding admission that could not be re-litigated on appeal. *Id.* Second, the court of appeals calculated whether, based on the People's admission of when they received actual notice, McKimmy's various trials were conducted within the UMDDA's time limit. It ultimately held that McKimmy's behavior did not operate to toll the Act's respective deadlines, meaning the trial court lost jurisdiction of all four cases prior to trial. *See id.* at 13–21. Therefore, the court of appeals directed the trial court to vacate McKimmy's convictions. *Id.* at 21. We granted certiorari.

## II. Preservation of "Actual Notice" Argument for Appeal

■ ¶ 16 As a preliminary matter, we must determine whether the People may pursue their argument regarding "actual notice" on appeal. In responding to McKimmy's initial motion to dismiss, the People conceded that they had actual notice of each of his requests when the prosecution first received the respective letters.[4] The People now contend, however, that the prosecution lacked actual notice of *any* of McKimmy's requests until September 9, 2008, when McKimmy first mentioned the UMDDA in open court. The court of appeals refused to consider this argument, holding instead that the People were "bound by [their] representation that [they] had actual notice of McKimmy's requests." *Id.* at 11 (citing *People v. Curren,* 228 P.3d 253, 257 (Colo.App. 2009)).

---

4. Specifically, the response acknowledged that "the People received letters from the Defendant demanding compliance with the UMDDA" on November 19, 2007; March 6, 2008; and August 26, 2008. The response further stated, "The People ... agree that the Defendant has 'substantially complied' with the requirements of the UMDDA, and that the People had 'actual notice' of said compliance on the afore-mentioned dates."

¶ 17 We do not perceive appellate procedure to operate so rigidly. In citing *Curren,* the court of appeals impliedly equated the People's statement to a binding judicial admission, which *Curren* defined as "a formal, deliberate declaration that a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." 228 P.3d at 257 (citing *Kempter v. Hurd,* 713 P.2d 1274, 1279 (Colo. 1986)). That same case, however, recognized that the doctrine of judicial admission "has been applied in very limited contexts" and that no authority exists purporting to bind an appellate court to "the prosecution's statements in the trial record." *Id.* Furthermore, the doctrine only applies to pro-forma factual matters—it does not pertain to contested issues of law. *Miller v. Brannon,* 207 P.3d 923, 929 (Colo.App.2009). As this case illustrates, the proper definition of "actual notice" is a legal question, not a factual one. Therefore, that the People conceded "actual notice" in opposing a motion to dismiss does not mean that they forfeited the right to litigate the interpretation of that legal term of art on appeal.

¶ 18 Accordingly, we conclude that the People may advance their preferred definition of "actual notice" on appeal and that the issue is properly before us.

### III. Standard of Review

¶ 19 We review issues of statutory interpretation de novo. *Cain v. People,* 2014 CO 49, ¶ 10, 327 P.3d 249; *see also People v. Adolf,* 2012 COA 60, ¶ 9, 296 P.3d 251 (interpreting the UMDDA de novo). In post-conviction cases involving mixed questions of law and fact, we defer to the post-conviction court's factual findings provided they are supported by competent evidence, but we review the court's legal conclusions de novo.

*People v. Kyler,* 991 P.2d 810, 818 (Colo. 1999).[5]

### IV. Analysis

¶ 20 We have previously determined that even when a defendant fails to strictly comply with the UMDDA, he nevertheless invokes his rights under the Act if (1) his request substantially complies with the Act's requirements, and (2) the prosecution receives "actual notice" of his request. *See Mascarenas,* 666 P.2d at 106. But we have never defined "actual notice." Thus, although this case is factually complex, the legal issue that we must resolve on certiorari is straightforward: whether the prosecution's *receipt* of a valid UMDDA request, absent actual *knowledge* of the request, constitutes "actual notice."

¶ 21 To answer this question, we first examine the text of the UMDDA and its underlying purpose, as well as our jurisprudence regarding substantial compliance. We then consider whether merely sending a substantially compliant UMDDA request to the prosecution suffices to provide "actual notice." We conclude that it does not and instead determine that for purposes of the UMDDA, "actual notice" means "actual knowledge." Finally, because the record in this case is unclear as to when the prosecution obtained actual knowledge of McKimmy's various UMDDA requests, we remand to the trial court for further fact-finding.

### A. The UMDDA

¶ 22 The UMDDA provides that "[a]ny person who is in the custody of the department of corrections ... may request final disposition of any untried indictment, information, or criminal complaint pending against him in this state." § 16–14–102(1). Once the trial court and the prosecution re-

---

5. The People urge us to review the trial court's rulings for an abuse of discretion, citing *Mascarenas,* 666 P.2d at 106, where we held that when a UMDDA violation occurs, *"it is not an abuse of discretion* for the trial court to dismiss pending charges under the Act" (emphasis added). This argument is distorted. In *Mascarenas,* we did not review the trial court's findings for an abuse of discretion. Rather, we concluded *as a matter of law* that the defendant invoked his rights under the Act. *See id.* We then recognized that, because the Act requires dismissal if the defendant invokes his UMDDA rights and trial is not held within the statutorily prescribed time limit, the trial court properly dismissed the charges. *See id.* Thus, our comment that the trial court did not "abuse its discretion" did not implicate our standard of review—it simply reflected the fact that the trial court acted correctly.

ceive such a request, the prisoner must be brought to trial on the relevant charge within 182 days. § 16–14–104(1). We have recognized that the Act's primary purpose is "to provide a mechanism for prisoners to insist upon speedy and final disposition of untried charges ... so that prison rehabilitation programs initiated for the prisoners' benefit will not be disrupted." *People v. Higinbotham,* 712 P.2d 993, 997 (Colo.1986). We have also observed, however, that the UMDDA functions as "one of several Colorado statutes implementing the speedy trial rights guaranteed to a defendant" under the United States and Colorado Constitutions. *Id.* at 996; *see also Johnson v. People,* 939 P.2d 817, 820 (Colo.1997) (noting that the UMDDA "reflect[s] the ... policy of facilitating the speedy disposition of untried charges upon a proper request by an incarcerated person"). Consonant with that purpose, the Act mandates that if a prisoner invokes his rights but the trial court fails to comply with the 182–day deadline, "no court of this state shall any longer have jurisdiction" over the relevant charge, and "the court shall dismiss it with prejudice." § 16–14–104(1).

¶ 23 For a prisoner to invoke his rights under the Act, his request must be in writing and must be addressed both "to the court in which the indictment, information, or criminal complaint is pending and to the prosecuting official charged with the duty of prosecuting it." § 16–14–102(1). But while the Act requires prisoners to *address* their requests to the court and the prosecutor, it does not contemplate them actually *sending* such requests to those parties directly. Rather, the UMDDA provides that any request "shall be delivered to the superintendent where the prisoner is confined." § 16–14–103(1), C.R.S. (2014). The superintendent must then send a registered copy of the prisoner's request to both the court and the prosecutor. § 16–14–103(1)(b). Conforming with the Act's requirements in this manner is known as

"strict compliance." *See People v. Fleming,* 900 P.2d 19, 22 n.6 (Colo.1995).

¶ 24 Strict compliance, however, is not the only manner by which a prisoner can invoke his right to speedy disposition under the UMDDA. That is, even when a prisoner fails to send his request to the superintendent—and thus fails to strictly comply with the Act—we have determined that he nevertheless invokes his rights under the UMDDA if (1) his request substantially complies with the Act's requirements, and (2) the prosecution receives "actual notice" of the request. *See Mascarenas,* 666 P.2d at 106.[6] The first element is not at issue in this case, as it is undisputed that McKimmy's separate letters—each of which "formally request[ed] protection under the Uniform Mandatory Disposition of Detainers Act" and included an accompanying citation to section 16–14–102 of the Colorado Revised Statutes—all substantially complied with the Act. *See People v. Campbell,* 742 P.2d 302, 310 (Colo.1987) (holding that a letter that made "no mention of the [UMDDA] by name or statutory citation" but "simply [made] a 'demand for trial' and for a 'speedy trial'" was "too indefinite to constitute a request for disposition of the defendant's untried [charge] under the [UMDDA]," whereas a different letter that "was couched in terms of a motion to dismiss for failure to have complied with the 'UNIFORM MANDATORY DISPOSITION OF DETAINERS ACT, found in Article 14 of the Colorado Revised Statutes,' ... sufficiently identified the Act to constitute a request"). But substantial compliance alone is insufficient to satisfactorily invoke a prisoner's UMDDA rights. In addition, the prosecution must receive "actual notice" of the prisoner's request. Accordingly, we now turn to the issue squarely before us in this case: the proper definition of "actual notice" for purposes of substantial compliance under the UMDDA.

---

6. The parties tend to refer to this entire two-step process as "substantial compliance," as an alternative to "strict compliance." But as our emphasis of the word "and" in *Mascarenas* suggests, the process is better articulated as "substantial compliance plus notice," as both elements are required for a prisoner to invoke his UMDDA rights. *See id.* (holding that a prisoner invokes his UMDDA rights if he "has substantially complied with the provisions of the Act *and* the prosecution has actual notice of the prisoner's request").

## B. "Actual Notice" Means "Actual Knowledge" Under the UMDDA

¶ 25 The parties advance dueling interpretations of the term "actual notice." McKimmy argues that "actual notice" is satisfied under the Act whenever the prosecution *receives* a prisoner's UMDDA request. The People counter that "actual notice" equates to "actual knowledge," meaning mere receipt of the request is insufficient—rather, in the People's view, the prosecution must actually become aware of the letter's contents for the letter to invoke the prisoner's UMDDA rights.

¶ 26 To resolve this dispute, we first note that the doctrine of substantial compliance (plus notice) is not codified by statute; rather, it is judicially created. Therefore, we must examine the cases that gave birth to the doctrine. In *Mascarenas*, the defendant drafted a substantially compliant UMDDA request but never delivered it to the superintendent of the institution in which he was confined. 666 P.2d at 106. Instead, he mailed the request to the trial court, which immediately forwarded it to the prosecution and "issued an order directing the prosecution 'to take appropriate steps to bring this defendant to trial.'" *Id.* at 105. Because the prosecution failed to do so within the UMDDA's deadline, the trial court granted the defendant's motion to dismiss. *Id.* In affirming the trial court's dismissal, we determined that even though the defendant failed to strictly comply with the Act, he nevertheless invoked its protections. *Id.* at 106. Specifically, we noted that it was "apparent that the prosecutors . . . had actual notice of [the defendant's] attempt to invoke the Act," and we thus held that "[w]here a prisoner has substantially complied with the provisions of the Act *and* the prosecution has actual notice of the prisoner's request," his UMDDA request is operative. *Id.*

¶ 27 Notably, the defendant in that case also drafted an analogous UMDDA request

regarding an untried charge in a different county, and he again mailed this request directly to that county's trial court. *Id.* at 105. Unlike the first trial court, however, the second court never forwarded the request to the prosecution, meaning "notice was not given until the day of the trial." *Id.* at 106. We held that the defendant's "minimal attempts" to invoke the Act were ineffectual. *Id.* In support, we noted that the trial court conducted seven hearings *after* the defendant mailed his request, but the defendant never mentioned the Act at any of those hearings. *Id.* Therefore, because the defendant "could have easily cured any defects in his request" but failed to do so, his second letter did not function to invoke his UMDDA rights. *Id.* at 107.

¶ 28 Four years later, we again tackled the concept of substantial compliance plus notice in *Campbell*. In that case, the defendant sent a detailed UMDDA request to the chief judge of the district in which he was being held. 742 P.2d at 303. The trial court received the request and then mailed a copy to the prosecution, but "[n]o action was taken to bring the matter to trial." *Id.* at 303, 310. In affirming the trial court's dismissal, we rejected the People's argument that the defendant failed to properly notify the prosecution, stating that the prosecution's receipt of the UMDDA request from the court "fulfilled the statutory purpose of giving notice to the prosecuting official and substantially complied with that requirement of the . . . Act." *Id.* at 310.

¶ 29 Of course, neither *Mascarenas* nor *Campbell* addressed the precise situation presented in this case, in which the prosecution received the defendant's letter but did not become aware of its contents. Furthermore, neither decision explicitly used the term "knowledge," instead simply recognizing that the prosecution received "notice" of the defendant's request once the trial court forwarded it.[7] But the two cases nonetheless

---

7. Several opinions from the court of appeals have used the term "actual knowledge" in relation to the UMDDA. *See, e.g., People v. Roberts,* 2013 COA 50, ¶ 23, 321 P.3d 581 (holding that the defendant's "UMDDA rights were not 'perfected' until . . . 'the court and prosecution [ob-

tained] actual knowledge of [his] request'" (second and third alterations in original) (quoting *People v. Gess,* 250 P.3d 734, 737 (Colo.App. 2010))); *Adolf,* ¶ 16 ("Even if we were to assume that [the] defendant's notice is some proof that he addressed [his request] to the superintendent,

imply that if a prisoner wishes to invoke his UMDDA rights via substantial compliance plus notice, his request only becomes effective once the prosecution actually becomes aware of it. Indeed, in *Mascarenas*, the defendant's first request was operative because the prosecution gained knowledge of it; in contrast, the second was inoperative because the prosecution never knew it even existed. *See* 666 P.2d at 106. Thus, in the context of the doctrine of substantial compliance under the UMDDA, the concepts of "actual notice" and "actual knowledge" are inextricable.

¶ 30 Equating "actual notice" with "actual knowledge" also harmonizes with one of the UMDDA's underlying purposes, which is to guarantee prisoners' constitutional rights to speedy trial. *See Higinbotham*, 712 P.2d at 996. Applying this rationale to our substantial compliance precedent, logic dictates that the prosecution can only effectuate the Act's goal of ensuring speedy trials if it gains actual knowledge of a defendant's UMDDA request. At its core, the Act equips prisoners with a shield to protect them from being confined in jail indefinitely while awaiting trial; it does not arm them with a sword that they can wield to escape trial altogether. Certainly, the Act requires the court and the prosecution to safeguard a defendant's UMDDA rights once he actually invokes them. But the prosecution cannot be expected to affirmatively enforce a defendant's UMDDA request under substantial compliance if it never learns of the request in the first place.

¶ 31 McKimmy nevertheless contends that the absence of the term "knowledge" in *Mascarenas* and *Campbell* is dispositive, going so far as to suggest that "Colorado precedent expressly rejects the [People's] argument that actual knowledge is required." Answer Brief at 15. Instead, in McKimmy's view, the two cases illustrate that actual notice is satisfied once a UMDDA request is *sent* to the prosecution, regardless of who sends it.

*Id.* ("According to the Court's holdings in these cases, a defendant's burden to provide notice is met so long as a UMDDA request is sent to the prosecution by either the defendant or the court or a superintendent, or *arguably anyone.*" (emphasis added)).

¶ 32 We are unpersuaded. To begin with, McKimmy's assertion that *Mascarenas* and *Campbell* "expressly reject[ ]" the requirement of actual knowledge is simply untrue. We may not have affirmatively equated "actual notice" with "actual knowledge" in those cases, but we by no means rejected that equation, expressly or otherwise. Moreover, we do not construe our case law to support the far-reaching notion that *any person*— even one unaffiliated with the litigation—can satisfy the requirement of actual notice on the defendant's behalf simply by sending his UMDDA request to the prosecution. Rather, *Mascarenas* and *Campbell* stand for the narrower, self-evident proposition that when *the court* issues a directive to the prosecution regarding the defendant's UMDDA request, the prosecution must comply. *Cf. People v. Thurman*, 787 P.2d 646, 655 (Colo.1990) (recognizing that a trial court can impose sanctions against the prosecution for its "willful refusal" to comply with a disclosure order). Thus, once the court in *Mascarenas* forwarded the defendant's UMDDA request to the prosecution and explicitly ordered it to "take appropriate steps to bring this defendant to trial," 666 P.2d at 105, the prosecution gained actual knowledge of the request. It was this element of knowledge—not the mere fact that the prosecution received the request—that operated to invoke the defendant's UMDDA rights.

¶ 33 McKimmy argues that requiring him to divine whether the prosecution gained actual knowledge of his request would impose an impossible burden upon him. Essentially, he contends that he did everything he possibly could to invoke his UMDDA rights. The record, however, refutes this contention. Not only did McKimmy actively con-

... it does not overcome the record evidence that the prosecutor did not have actual knowledge of the notice."). These cases, however, are inapposite. In *Roberts*, the defendant's UMDDA request consisted of a single sentence buried within a four-page document, meaning it did not

"readily alert[ ] the court or the prosecution to his invocation of UMDDA rights." ¶ 22. And in *Adolf*, the defendant did not send his request to the prosecution, and no evidence suggested that the court ever forwarded the request. ¶ 14.

ceal his UMDDA requests from his own counsel, but he then compounded his deception by refusing to mention the UMDDA during the numerous hearings at which he voiced generalized concerns regarding "speedy trial." Indeed, even when the judge at the conflict hearing pressed him for specifics regarding his alleged "jurisdictional grounds" for dismissal, McKimmy's responses were vague and evasive. In essence, McKimmy attempted to use his UMDDA requests to get his charges dismissed, not to get them tried. His behavior in this regard bears a striking similarity to that of the defendant in *Mascarenas,* who neglected to mention his UMDDA request during seven separate hearings. *Id.* at 106.

¶ 34 Moreover, McKimmy's assertion that he had no other avenue to invoke his UMDDA rights is patently false. McKimmy need not have relied on the prosecution to gain knowledge of his requests; instead, he could have simply delivered his request to the superintendent and thus strictly complied with the statute, thereby obviating the actual notice requirement. But he elected to pursue the path of substantial compliance, a path that plainly requires notice. We reiterate that this alternative method of invoking one's UMDDA rights is a judicially created mechanism—the UMDDA does not authorize it at all. As such, we must be wary of expanding too broadly the manner in which prisoners can invoke their rights under the Act without actually complying with the statute. *See City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r,* 105 P.3d 595, 608 (Colo.2005) ("Exceptions to the general laws should be narrowly construed. The legislature, not the court, should expand these exceptions if desirable." (citation omitted)).

¶ 35 In spite of this, McKimmy argues that in his case, substantial compliance was not an alternative mechanism but was in fact the only available method by which he could invoke his UMDDA rights. Specifically, McKimmy claims that because he was incarcerated in the Jefferson County Jail rather than the Department of Corrections ("DOC"), he was literally incapable of strictly complying with the UMDDA, as no DOC superintendent existed to take receipt of his request. *See* § 16–14–103(1) (providing that any UMDDA request "shall be delivered to the superintendent where the prisoner is confined"). But we have repeatedly held that parolees incarcerated in county jail remain in custody of the DOC. *See, e.g., People v. Trancoso,* 776 P.2d 374, 380 n.8 (Colo.1989) ("Although [the defendant] was physically confined at the El Paso County Jail at the time he delivered his request to the superintendent, he was in the legal custody of the department of corrections at that time because he was a parolee at the time of his arrest."); *Campbell,* 742 P.2d at 309 ("[E]ven when in county jail [the parolee-defendant] was in the custody of the department of corrections within the meaning of [the UMDDA]."). Indeed, in *Trancoso,* the defendant sent a letter to the superintendent of the Territorial Correctional Facility in Cañon City while he was incarcerated in the El Paso County Jail, and we held that this letter sufficed to invoke his UMDDA rights. 776 P.2d at 376, 379. Because the same circumstances apply to McKimmy's case, his argument is without merit.

¶ 36 Finally, we reject McKimmy's argument that requiring actual knowledge is "unfair, unjust, and inconsistent with the purpose of the UMDDA." Answer Brief at 19. In equating "notice" with "knowledge" under the Act, we are hardly crippling the alternative method of substantial compliance entirely. Instead, we are simply explicating what we have always implied: that if a prisoner attempts to invoke his UMDDA rights in a matter not authorized by the Act, the prosecution must become aware of that attempt. Certainly, prosecutors cannot bury their heads in the sand and prevent prisoners from invoking their UMDDA rights through willful ignorance. But bad-faith misconduct differs from honest mistake, and McKimmy does not allege prosecutorial malfeasance here, as it is undisputed that the prosecutor simply failed to take notice of McKimmy's 2007 pro-se letters. We do not condone the prosecution's carelessness, but we cannot conclude that its inattention rendered the requests operative under the Act. Again, if McKimmy wished to ensure that the prosecution was aware of his requests, he could have informed his own counsel of the issue or raised it in open court.

Because he chose not to take such actions, the prosecution did not gain actual knowledge of the 2007 requests until well after it received them.

¶ 37 Accordingly, we hold that for the purposes of substantial compliance with the UMDDA, "actual notice" means "actual knowledge." Therefore, when a prisoner fails to strictly comply with the UMDDA, he nevertheless invokes his rights under the Act if (1) his request substantially complies with the Act's requirements, and (2) the prosecution receives actual notice—that is, actual knowledge—of the request. With this understanding of the Act in mind, we now address whether any UMDDA violations occurred in McKimmy's four cases.

### C. Remand Is Required

■ ¶ 38 As we have illustrated, once a prisoner invokes his UMDDA rights—whether through strict compliance or substantial compliance plus notice—he must be brought to trial within 182 days. § 16–14–104(1). Here, McKimmy sent substantially compliant requests in four different cases. Ideally, if the record definitively established when the prosecution gained actual notice (that is, actual knowledge) of these separate requests—and, thus, when the proverbial UMDDA clock began to run in each case—we could calculate whether McKimmy's trials were held within the 180–day deadline.[8] Unfortunately, the convoluted record in this case renders such a task impossible. We simply cannot determine, with any degree of confidence, when the prosecution gained actual knowledge of McKimmy's particular UMDDA request in each case. Therefore, we must remand to the trial court to conduct further fact-finding on this issue.

¶ 39 We also note that the overarching issue for the trial court to resolve on remand remains whether any UMDDA violations occurred. Thus, in addition to determining when McKimmy invoked his UMDDA rights (i.e., when the prosecution gained actual knowledge of his respective requests) and counting forward 180 days from that point,

the trial court may also need to address whether McKimmy waived those rights. The court of appeals performed a detailed analysis in this regard, holding that (1) McKimmy never expressly waived his UMDDA rights, and (2) to the extent that McKimmy's behavior tolled the Act's 180–day deadline, the trial court nevertheless failed to hold his trials within the deadline. *McKimmy*, slip op. at 13–17. But because the court of appeals declined to address the issue of actual notice, it predicated its analysis on the notion that McKimmy invoked his UMDDA rights as soon as the prosecution received his letters. *Id.* at 12 ("[B]ecause McKimmy substantially complied with the UMDDA and the prosecution conceded it had actual notice of his requests, we conclude that the UMDDA deadline began to run on the dates that the prosecution admitted it received actual notice of the requests."). As we have illustrated, this was incorrect. *Supra*, ¶¶17–18. Because the issue of waiver and/or tolling is not before us, we express no opinion on the matter other than to point out that the issue may be relevant to the trial court's ultimate analysis on remand.

### V. Conclusion

¶ 40 We have previously determined that under the doctrine of substantial compliance plus notice, even when prisoners do not strictly comply with the UMDDA's procedural requirements, they nevertheless invoke their rights under the Act if (1) their request substantially complies with the Act's requirements, and (2) the prosecution receives "actual notice" of their request. We now hold that, for purposes of the second prong under the UMDDA, "actual notice" means "actual knowledge." Accordingly, we reverse the judgment of the court of appeals and remand with instructions to return the case to the trial court for further fact-finding. On remand, the trial court should determine: (1) when the prosecution gained actual knowledge of McKimmy's UMDDA requests in each of his four cases, at which point he would have effectively invoked his rights un-

---

8. The effective version of the UMDDA at the time of McKimmy's trials provided for a time period of 180 days, rather than 182 days as currently

mandated. *Compare* § 16–14–104(1), C.R.S. (2011), *with* § 16–14–104(1), C.R.S. (2014).

der the Act; and (2) whether any UMDDA violations subsequently occurred.

JUSTICE MÁRQUEZ dissents.

JUSTICE BOATRIGHT does not participate.

JUSTICE MÁRQUEZ, dissenting.

¶ 41 I respectfully dissent. The Uniform Mandatory Disposition of Detainers Act ("UMDDA") expressly provides that "the receipt of the request" by the court and prosecutor triggers the prosecution's obligation to timely dispose of a prisoner's untried charges. § 16–14–104(1), C.R.S. (2014). Despite this plain language establishing "receipt of the request" as the speedy trial clock trigger, and despite this court's case law "liberally constru[ing]" the UMDDA to allow a prisoner's substantial compliance with the Act to secure its protections so long as the prosecution has "actual notice" of the prisoner's request, see People v. Trancoso, 776 P.2d 374, 380 (Colo.1989), the majority today imports a new "actual knowledge" requirement into the Act that cannot be squared with the plain language of the statute. Maj. op. ¶ 21.

¶ 42 Specifically, the majority concludes that even where a prisoner's pro-se written UMDDA requests are unmistakably clear and even where the court and the prosecutor's office actually *receive* those requests, the prisoner still cannot claim the protections of the UMDDA unless and until he can also prove the prosecutor has "actual knowledge" of the requests sitting in the prosecutor's own case file. *Id.* at ¶¶ 4, 40. Indeed, rather than charge the prosecution with actual notice of the contents of its own files—as the "receipt" trigger in section 16–14–104(1) essentially requires—the majority now requires the prisoner to establish precisely when, following receipt, the prosecutor obtained "actual *knowledge*" of the prisoner's request. *Id.* at ¶ 21 (emphasis added) (remanding for determination of when the prosecution gained actual knowledge of McKimmy's requests). As a practical matter, the majority's new requirement unfairly burdens prisoners and effectively rewards the prosecution where it neglects to review its files or otherwise misplaces a prisoner's UMDDA request.

¶ 43 There is no question that the single-page, written requests in this case, which were properly addressed to the court and prosecution, substantially complied with the requirements of the UMDDA. In my view, the prosecution's undisputed receipt of such requests constitutes "actual notice" for the purpose of triggering a prisoner's speedy trial rights under our UMDDA case law. Accordingly, I respectfully dissent.

I.

¶ 44 The UMDDA provides that a person in the custody of the department of corrections may request a final disposition of any untried charges pending against him in Colorado. §§ 16–14–101 to –104, C.R.S. (2014). The Act gives prisoners a mechanism to insist on the speedy disposition of such untried charges, which otherwise can disrupt or preclude a prisoner's access to prison rehabilitation programs. *People v. Higinbotham*, 712 P.2d 993, 997 (Colo.1986); *People v. Mascarenas*, 666 P.2d 101, 105 (Colo.1983). When properly invoked, the UMDDA requires the court to dismiss the untried charges with prejudice if they are not brought to trial within the UMDDA's speedy trial period. § 16–14–104(1).

¶ 45 When interpreting the UMDDA, this court has held that a prisoner who fails to strictly comply with the Act's procedural requirements nonetheless sufficiently invokes his speedy trial rights if he substantially complies with its provisions and the prosecution has "actual notice" of the prisoner's request. *Mascarenas*, 666 P.2d at 106; *accord People v. Campbell*, 742 P.2d 302, 310 (Colo. 1987).

¶ 46 Because no one disputes that McKimmy's requests "substantially complied" with the Act's requirements, the dispositive issue here is what constitutes "actual notice" to the prosecution of McKimmy's requests. The majority concludes that, for the purpose of substantial compliance under the UMDDA, "actual notice" necessarily means "actual knowledge." Maj. op. ¶ 21. The majority asserts that this court has never defined

"actual notice" in the context of the UMDDA. *Id.* at ¶ 20. It then reasons that equating "actual notice" with "actual knowledge" serves the UMDDA's purpose of protecting a prisoner's constitutional right to a speedy trial because "logic dictates" that the prosecution can effectuate the Act's goals only if it has "actual knowledge" of a prisoner's request. *Id.* at ¶ 30. Applying its new "actual knowledge" requirement here, the majority concludes that the prosecution did not have "actual notice" of McKimmy's requests—not because the prosecution never received McKimmy's letters, but rather, because his requests apparently were "stuck in between ... some computer printouts" in the prosecution's file and thus got "lost in the shuffle." *Id.* at ¶ 12.

¶ 47 Although the majority limits its new "actual knowledge" requirement to invocations of the UMDDA "in the context of the doctrine of substantial compliance," *id.* at ¶ 29; *see also id.* at ¶¶ 30, 34, it can point to no language in the Act that justifies this limitation. Nor is the majority's rationale for its new requirement logically limited to a substantial compliance analysis. In other words, if "logic dictates" that the prosecution can effectuate the Act's goals "only ... if it gains actual knowledge" of a prisoner's request, *see id.* at ¶ 30, then such logic necessarily applies to *every* request under the UMDDA—including those that strictly comply with the Act's requirements. Assuming the prosecution actually receives a prisoner's UMDDA request, the majority's logic cannot explain why the prosecution's "actual knowledge" of that request is necessary under a substantial compliance analysis (because the prisoner sent the request directly to the prosecution), yet would be irrelevant under a strict compliance analysis (had the prisoner instead sent the identical request to the prison superintendent). Thus, I fail to discern in the majority's logic any principled basis to conclude that, after today, the prosecution's mere "receipt of the request" ever suffices to trigger a prisoner's UMDDA speedy trial rights.

¶ 48 By defining "actual notice" as "actual knowledge," the majority effectively invents a new UMDDA requirement that exists nowhere in the statute and, in so doing, misreads *Mascarenas* and our subsequent case law applying its "substantial compliance" rule. This result is troubling not only because it contravenes the express language of the statute, but, in doing so, it effectively places the trigger of the prisoner's UMDDA speedy trial clock squarely in the hands of the prosecution.

## II.

### A.

¶ 49 I begin by looking to the language of the UMDDA. Section 16–14–102(1) requires a prisoner who seeks to invoke his UMDDA speedy trial rights to submit a request "in writing," "addressed to the court" in which the indictment, information, or criminal complaint is pending, "and to the prosecuting official" responsible for prosecuting it. The written request must also "set forth the place of confinement." *Id.* Section 16–14–103(1)(b) requires the prisoner's request to be "delivered to the superintendent where the prisoner is confined," who must then forward a copy of the request to the court and the prosecuting attorney.

¶ 50 Importantly, section 16–14–104(1) expressly provides that "receipt of the request" by the court and the prosecuting official triggers the speedy trial period, and if the charges are not tried within that period, the court loses jurisdiction and must dismiss the charges with prejudice:

> Within one hundred eighty-two days[1] after the *receipt of the request* by the court and the prosecuting official, ... the indictment, information, or criminal complaint shall be brought to trial.... If after such a request, the indictment, information, or criminal complaint is not brought to trial within that period, no court of this state shall any longer have jurisdiction thereof, nor shall

1. As the majority notes, when McKimmy sought to invoke his rights under the UMDDA, the version of the Act then in effect established a 180–day speedy trial period, rather than the current 182–day period. *See* maj. op. ¶ 38 n.8 (citing § 16–14–104(1), C.R.S. (2011); § 16–14–104(1), C.R.S. (2014)).

the untried indictment, information, or criminal complaint be of any further force or effect, and the court shall dismiss it with prejudice.

§ 16–14–104(1) (emphasis added). This language plainly tethers the speedy trial clock trigger to "receipt of the request" and not to the point at which, following receipt, the prosecuting official actually *reviews* the prisoner's request. Also notably absent from this statutory language is any requirement that the prisoner verbally reiterate his request in open court in order to invoke the UMDDA.

¶ 51 Moreover, so long as the court and prosecution actually receive the request, nothing in section 16–14–104(1) expressly requires the prisoner's request to be received *directly from the superintendent*. In other words, a prisoner who addresses and mails his request directly to the court and the prosecuting attorney has, for all practical purposes, fulfilled the superintendent's most important statutory duty under section 16–14–103(1)(b) by sending the request to the entities with the power and responsibility to enforce his speedy trial rights. I recognize that strict compliance with the UMDDA is preferable. That said, the plain language of the statute evinces the General Assembly's intent to make "receipt of the request" sufficient to bind the court and the prosecutor to the UMDDA trial timeline.

**B.**

¶ 52 In addition to the plain language of the statute, this court's case law confirms that receipt, and not "actual knowledge," is the requisite legal standard under the UMDDA. *Trancoso,* 776 P.2d at 377 ("*Receipt* of these materials by the court and prosecutor ... initiates [the] period within which the prisoner must be brought to trial, failing which the charge must be dismissed." (emphasis added) (citing *Higinbotham,* 712 P.2d at 996)); *Campbell,* 742 P.2d at 303 (concluding that, where a prisoner was not brought to trial within the speedy trial period after receipt of his UMDDA request, his UMDDA rights were violated); *Mascarenas,* 666 P.2d at 105 (noting that the "*receipt* of the request" triggers the time period for the prose-

cution to "bring the untried matters to trial" (emphasis added)).

¶ 53 In *Mascarenas,* the prisoner sought to invoke his UMDDA rights by mailing written requests directly to the district courts in both El Paso and Weld Counties. 666 P.2d at 105. The El Paso County District Court forwarded Mascarenas's request to the prosecution in that district and issued an order directing the prosecution to bring the defendant to trial. *Id.* By contrast, the clerk for Weld County District Court did not forward the request to the prosecuting official in that district. *Id.* at 106. Today, the majority suggests that Mascarenas's first request (to the El Paso County District Court) was operative because the prosecution "gained knowledge" of it; in contrast, the second (to the Weld County District Court) was inoperative because the prosecution "never knew it even existed." Maj. op. ¶ 29.

¶ 54 However, a closer reading of *Mascarenas* reveals that we tethered our analysis in that case to "receipt" rather than "actual knowledge." Specifically, this court concluded that the prosecution in the El Paso case had "actual notice" of Mascarenas's attempt to invoke the Act because "[his] request was subsequently *delivered to the El Paso County district attorney.*" *Mascarenas,* 666 P.2d at 106 (emphasis added). Nothing in our discussion hinted that actual notice to the district attorney in that case required more than mere "delivery" of the prisoner's request. And the Weld County prosecuting official was unaware of the request because "[u]nlike the El Paso County case, the *request was not forwarded* to the prosecuting official." *Id.* (emphasis added).

¶ 55 In short, the prosecution in the El Paso County case had "actual notice" of the request because it actually *received* the request; the prosecution in Weld County did not have actual notice because it *did not receive* the request. This view of *Mascarenas* harmonizes its result with the plain language "receipt" standard of the UMDDA.

¶ 56 Our decision in *Campbell,* issued four years after *Mascarenas,* likewise equated "notice" with "receipt." 742 P.2d at 303. In that case, we observed that on July 19, 1984,

the prisoner wrote a letter to the chief judge of the district court requesting that the court dismiss his charges based on a violation of the UMDDA. *Id.* We noted that "[t]he court *received* the letter on July 23, and a copy was *received* by the district attorney on that same day," yet the prosecution took no action to bring the matter to trial. *Id.* (emphasis added). The district court in that case ultimately dismissed the charges because the prosecution did not bring the prisoner to trial within 90 days[2] of "the receipt of his July 19, 1984, letter by the court and the district attorney...." *Id.* at 304.

¶ 57 In reviewing on appeal whether the prisoner's July 19, 1984 letter sufficiently invoked his rights under the UMDDA, we referred to our requirement in *Mascarenas* that the prosecution have "actual notice" of the prisoner's request. *Id.* at 310 (citing *Mascarenas*, 666 P.2d at 106). Crucially, we observed that actual notice hinges on receipt:

> Although the defendant did not mail a copy of his request to the district attorney's office, the *court provided the prosecutor with actual notice of the defendant's letter by mailing a copy to his office.* The district attorney *received* the July 19, 1984, letter on July 23. *This fulfilled the statutory purpose of giving notice* to the prosecuting official....

*Id.* at 310 (emphasis added) (citing *Mascarenas*, 666 P.2d at 106). This passage in *Campbell* confirms that the prosecution has "actual notice" when it receives the defendant's request.

¶ 58 Most recently, in *Trancoso*, we reaffirmed our view in *Campbell* that delivery and receipt are the touchstones of notice under the Act—not "actual knowledge." 776 P.2d at 374. In that case, the prisoner delivered his UMDDA request to a superintendent who failed to forward the request to the court and prosecution, as required by the UMDDA. *Id.* at 377, 380 (citing § 16–14–103). Importantly, we observed that, had the superintendent complied with his duties under section 16–14–103 to forward the requests, the court and prosecution "would have received copies of Trancoso's request,"

and that such compliance "would have fulfilled the statutory purpose of giving notice to the court and the prosecuting official under the Uniform Act." *Trancoso*, 776 P.2d at 380 (citing *Campbell*, 742 P.2d at 310).

¶ 59 In short, I disagree with the majority that "we have never defined 'actual notice' " in this context. *See* maj. op. ¶ 20. Indeed, our case law makes clear that this court requires only actual *"receipt"* to trigger the UMDDA speedy trial clock.

## C.

¶ 60 I fail to see how the majority can logically restrict its "actual knowledge" requirement to a "substantial compliance" analysis. *See id.* at ¶¶ 29–30, 34. If indeed "logic dictates that the prosecution can only effectuate the Act's goal of ensuring speedy trials if it gains actual knowledge of a defendant's UMDDA request," *id.* at ¶ 30, then such logic holds with respect to every UMDDA request—even where a prisoner "strictly" complies with the Act by sending a proper request to the superintendent.

¶ 61 Further, the majority's holding today has troubling implications for prisoners who must now prove prosecutors' "actual knowledge" of their UMDDA requests. As a practical matter, I fail to grasp how a prisoner might prove "actual knowledge" beyond reiterating his request in open court—a requirement that appears nowhere in the statute. Even where a prosecutor admittedly receives a request, a prisoner's UMDDA speedy trial clock trigger now depends upon when the prosecutor gains "actual knowledge" of that request. Today's holding not only creates problems of proof for the prisoner, but raises new issues: Is "knowledge" mere "awareness" of the request, or something more? And who must have this knowledge? Is it sufficient that a staff member know of the request? The prosecuting attorney alone? Although the majority suggests that "prosecutors cannot bury their heads in the sand and prevent prisoners from invoking their UMDDA rights through willful ignorance," it nevertheless absolves the prosecution of its

---

**2.** At the time of this case, the UMDDA provided for a 90-day speedy trial period. *Compare* § 16– 14–104(1), C.R.S. (1986), *with* § 16–14–104(1), C.R.S. (2014).

"inattention" in this case. *Id.* at ¶ 36. Indeed, the majority places no responsibility on the prosecution to be aware of the contents of its own files. Rather, it places the burden entirely on the prisoner to "ensure that the prosecution was aware of his requests" by "rais[ing] [them] in open court"[3] and blames McKimmy in this case "[b]ecause he chose not to take such actions." *Id.* Today's holding effectively rewards prosecutors who ignore the contents of their case files or misplace a prisoner's request—a result that I simply cannot square with the language of the statute and this court's case law.

### III.

¶ 62 McKimmy's pro-se written requests in this case clearly indicated his desire to invoke the UMDDA's protections. He addressed his letters to the court and the prosecutor, with "Request for Speedy Disposition" in the reference line of each letter. He identified his place of incarceration and case numbers. His single-page letters "formally request[ed] protection under the Uniform Mandatory Disposition of Detainers Act (CRS–16–14–102) in the above-named case number[s]." And critically, it is undisputed that the prosecution actually received these requests.

¶ 63 However, rather than place any burden on the prosecution to be aware of the contents of its own files, the majority instead accuses McKimmy of "deception" for choosing to "actively conceal" his prior written requests because he failed to refer specifically to the UMDDA when he repeatedly raised his speedy trial rights in colloquies with the court. *Id.* at ¶ 33. Yet the prosecution's failure to read those requests—due to negligence, oversight, or simply because it misplaced them—should not be blamed on the prisoner.

¶ 64 In my view, the UMDDA plainly tethers the speedy trial clock to the "receipt of the request" and nothing more. Here, the prosecution's undisputed receipt of McKimmy's requests constitutes "actual notice" un-

der our UMDDA case law for the purpose of triggering McKimmy's speedy trial rights. Accordingly, I respectfully dissent.

---

3. The majority repeatedly insists that McKimmy failed to inform his own counsel of his UMDDA requests, *see, e.g., id.* at ¶ 4, yet the record before us is at best unclear on this point.

