501 P.3d 803
The PEOPLE of the State of Colorado, Petitioner,
v.Patrick RAU, Respondent.
Supreme Court Case No. 20SC583 Supreme Court of Colorado.
January 10, 2022
Attorneys for Petitioner: Michael J. Allen, District Attorney, Fourth Judicial, District Doyle Baker, Senior Deputy District Attorney, Colorado Springs, Colorado
Attorneys for Respondent: The Bussey Law Firm, P.C., Timothy R. Bussey, Colorado Springs, Colorado
en banc
JUSTICE SAMOUR delivered the Opinion of the Court, in which CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART, and JUSTICE BERKENKOTTER joined.
JUSTICE SAMOUR delivered the Opinion of the Court.
¶1 Colorado's so-called Make My Day law, section 18-1-704.5, C.R.S. (2021), addresses the justified use of force against intruders in the home. The statute's nickname stems from a line in the film Sudden Impact. See People v. Alaniz, 2016 COA 101, ¶ 1 n.1, 409 P.3d 508, 510 n.1 (noting the nickname's origin). In one notable scene, a fictional police inspector known as "Dirty Harry" points his gun at a robber in a coffee shop and says, "Go ahead, make my day," seemingly "daring the suspect to give him an excuse to shoot." Dirk Johnson, Colorado Journal ; ‘Make My Day’: More Than a Threat, N.Y. Times, June 1, 1990, at A14. Although section 18-1-704.5 was originally called "The Home Protection Bill," its nickname was coined as the bill made its way through the legislature. See William Wilbanks, The Make My Day Law: Colorado's Experiment in Home Protection 1 (1990). The media then popularized the nickname as a way to describe, and perhaps criticize, the new legislation's broad protection.1 Id.
¶2 But the nickname is a misnomer. Though wide-ranging, the statute's safe harbor in no way permits an occupant of a dwelling to, à la Dirty Harry, egg on intruders to do something so as to have an excuse to shoot them. Thus, while the catchy nickname has stuck around, our preference is to refer to the statute by its citation or as the "force-against-intruders" statute. ¶3 Section 18-1-704.5 recognizes that "the citizens of Colorado have a right to expect absolute safety within their own homes." § 18-1-704.5(1). As pertinent here, it provides immunity from criminal prosecution for the use of physical force (including deadly physical force) against an intruder when certain specified conditions are met. See § 18-1-704.5(2) – (3) ; People v. McNeese, 892 P.2d 304, 309 (Colo. 1995). One of those conditions is implicated in this appeal: We must decide whether the defendant, Patrick Rau, was in a dwelling when he shot and killed an intruder in the basement of the house where he and his girlfriend rented an apartment. A division of the court of appeals concluded that the basement, which was accessible to all of the building's tenants and contained the building's heat and water controls, was part of Rau's dwelling. People v. Rau, 2020 COA 92, ¶¶ 1, 17, 490 P.3d 804, 806, 808. Therefore, it affirmed the district court's ruling that Rau was immune from prosecution for using deadly physical force against the intruder. Id. at ¶ 26, 490 P.3d at 809.
¶4 Relying on the definition of "dwelling" in section 18-1-901(3)(g), C.R.S. (2021), we now hold that the basement was part of Rau's dwelling because it was part of the building that he used for habitation. We view the basement in this case in much the same way we viewed the attached garage in People v. Jiminez, 651 P.2d 395, 396 (Colo. 1982). Just as the garage in Jiminez was part of the building that was used for habitation, the basement here was part of the building that Rau used for habitation. And just as some of the usual uses of the garage in Jiminez were incidental to and part of the use of the residence itself, some of the usual uses of the basement in this case were likewise incidental to and part of the use of Rau's residence. Accordingly, we affirm the division.
I. Facts and Procedural History
¶5 Rau and his girlfriend rented a second-floor apartment in an old 19th century Victorian home that had been converted into seven apartments.2 The door to the basement, which was just a few feet inside the home's rear entrance, was padlocked. However, the residents of all seven apartments had keys to the padlock and shared access to the basement. Although unfinished, the basement contained a central furnace, two hot water heaters, the home's only thermostat, and the plumbing infrastructure. In other words, the controls for the water and heat supply for all the apartments were located in the basement.3 As well, some of the residents stored household items in the basement.
¶6 Early one January morning, Rau's girlfriend noticed that the door to the basement was open. She told Rau that she suspected that an unhoused man had broken into the basement. Unhoused individuals apparently frequented the area and had previously broken into the building (including the basement), sometimes leaving drug paraphernalia and feces behind. Because police officers had failed (or had been slow) to respond to calls related to such unhoused individuals in the past, Rau grabbed a headlamp, armed himself with a loaded revolver, and made his way to the basement.
¶7 Upon arriving at the door to the basement, Rau noticed that it was indeed open and that there were pry marks around the padlock. As he descended the stairs, Rau turned his headlamp on because the basement was dark. He found D.R., a large man (six feet, five inches tall), asleep under a sleeping bag in a small storage closet. Additionally, Rau observed drug paraphernalia in D.R.’s general vicinity. Because, as the old adage goes, a picture is worth a thousand words, below are a few pictures depicting the front of the house, the door to the basement, and the storage closet where Rau found D.R. asleep.
?
?
?
¶8 Rau nudged D.R. with his foot in an attempt to wake him up. As Rau did so, he told D.R. that D.R. wasn't supposed to be there and needed to leave immediately. D.R., who at that point was only about five feet away from Rau, rose to his knees, became aggressive, began yelling unintelligibly, and proceeded to throw things around. Rau believed that D.R. had used drugs while in the basement and was under their influence. As D.R.’s behavior escalated, Rau became scared and warned D.R. multiple times that he had a gun. None of the warnings altered D.R.’s behavior, however, so Rau said he would "count to five" and if D.R. hadn't left when he finished counting, he would shoot. Rau loudly counted to five. Not only did D.R. refuse to leave, his menacing and intimidating behavior continued. Fearing that D.R. was going to charge at him, Rau fired his gun. D.R. died from the gunshot wound.
¶9 A grand jury indicted Rau for second degree murder (heat of passion). Before trial, Rau moved to dismiss the charge, arguing that he was immune from prosecution under the force-against-intruders statute. Following an evidentiary hearing, the district court agreed with Rau, granted his motion, and dismissed the charge against him.
¶10 The People appealed on two grounds. First, they asserted that the district court had erred in concluding that the basement was part of Rau's "dwelling," one of the conditions for immunity under section 18-1-704.5. Second, they maintained that Rau had presented insufficient evidence to establish two of the other conditions required for immunity under section 18-1-704.5 : (1) that he reasonably believed that D.R. might use physical force against him and (2) that he reasonably believed that D.R. had committed or intended to commit a crime in the dwelling (in addition to the uninvited entry).
¶11 A division of the court of appeals rejected both of the People's claims. Rau, ¶¶ 14, 20, 490 P.3d at 808. On the dwelling front, the division was unmoved by the People's reliance on People v. Cushinberry, 855 P.2d 18 (Colo. App. 1992), where a different division of the court of appeals determined that the common area of an apartment building was not part of a dwelling under the force-against-intruders statute. Rau, ¶ 18, 490 P.3d at 808. Instead, applying the statutory definition of dwelling and our holding in Jiminez, the division below concluded that the basement was part of Rau's dwelling. Id. at ¶¶ 18-19, 490 P.3d at 808. And, regarding the two other conditions mentioned above, the division held that the record supported the district court's rulings by a preponderance of the evidence. Id. at ¶ 25, 490 P.3d at 809. More specifically, the division explained that the evidence was sufficient to support the court's findings that Rau reasonably believed that "D.R. was going to use physical force against him" and that Rau reasonably believed that "D.R. had committed a crime or intended to commit a crime against a person or property in the building." Id. at ¶ 26, 490 P.3d at 809.
¶12 The People then sought certiorari, and we granted in part and denied in part their petition. We declined to take up the People's sufficiency challenge, but we agreed to consider whether the division mistakenly held that the basement was part of Rau's dwelling under section 18-1-704.5.4 ¶13 After setting forth the standard that controls our review and the relevant principles of statutory construction that guide our decision, we proceed to analyze the question before us. Because we agree with the division, we affirm.
II. Standard of Review and Relevant Principles of Statutory Construction ¶14 Whether the basement was part of Rau's dwelling hinges on the meaning of the word "dwelling" in section 18-1-704.5. Questions of statutory interpretation are questions of law that we review de novo. People v. Sprinkle , 2021 CO 60, ¶ 12, 489 P.3d 1242, 1245. ¶15 When we are called upon to interpret a statute, "our primary aim is to effectuate the legislature's intent." Nieto v. Clark's Market , Inc., 2021 CO 48, ¶ 12, 488 P.3d 1140, 1143. To carry out that goal, we must first and foremost apply the statute's words and phrases "in accordance with their plain and ordinary meanings." Bill Barrett Corp. v. Lembke, 2020 CO 73, ¶ 14, 474 P.3d 46, 49. If the statute's language is unambiguous, we are required to apply it as written. Delta Air Lines, Inc. v. Scholle, 2021 CO 20, ¶ 13, 484 P.3d 695, 699. We may not add words to the statute. Nieto, ¶ 12, 488 P.3d at 1143. Nor may we subtract words from it. Id. ¶16 We must read statutory words and phrases in context and in accordance with the rules of grammar and common usage. McCulley v. People , 2020 CO 40, ¶ 10, 463 P.3d 254, 257. Further, we have to "look to the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts." Nieto, ¶ 12, 488 P.3d at 1143 (quoting Lembke, ¶ 14, 474 P.3d at 49 ). And we must avoid interpretations that would render any statutory words or phrases "superfluous or lead to illogical or absurd results." McCoy v. People, 2019 CO 44, ¶ 38, 442 P.3d 379, 389. ¶17 If the legislature defines a particular term in a statute, "that definition governs." Farmers Ins. Exch. v. Bill Boom Inc., 961 P.2d 465, 470 (Colo. 1998). The legislature " ‘has the power to define terms used by it,’ and it is beyond question that those ‘statutory definitions control judicial interpretation.’ " People v. Rigsby, 2020 CO 74, ¶ 24, 471 P.3d 1068, 1076 (quoting Indus. Comm'n v. Nw. Mut. Life Ins. Co., 103 Colo. 550, 88 P.2d 560, 563 (1939) ). Thus, when the legislature decides to define a term it uses in a statute, that definition, "not an average person's understanding" of it, reigns supreme. Id.
III. Analysis
A. The Force-Against-Intruders Statute
¶18 Section 18-1-704.5 acknowledges in subsection (1) that the people of this state have the right to expect "absolute safety" in their homes. Subsections (2) and (3) then follow:
(2) [A]ny occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.
(3) Any occupant of a dwelling using physical force, including deadly physical force, in accordance with the provisions of subsection (2) of this section shall be immune from criminal prosecution for the use of such force.
¶19 The force-against-intruders statute resides in part 7 of article 1 of the criminal code (Title 18). Part 7 is labelled "Justification and Exemptions from Criminal Responsibility" and includes, alongside section 18-1-704.5, multiple affirmative defense statutes justifying the use of physical force: the use of physical force—special relationships, see § 18-1-703, C.R.S. (2021); the use of physical force in defense of a person, see § 18-1-704, C.R.S. (2021); the use of physical force in defense of premises, see § 18-1-705, C.R.S. (2021); and the use of physical force in defense of property, see § 18-1-706, C.R.S. (2021).
¶20 Section 18-1-704.5 is similar to section 18-1-704, which is known in legal parlance as the self-defense statute. Indeed, the two statutes are next-door neighbors. Unlike section 18-1-704, however, section 18-1-704.5 provides immunity from criminal prosecution—it bars criminal proceedings against a person who uses force (including deadly physical force) under the conditions listed in subsection (2).5 People v. Guenther, 740 P.2d 971, 975 (Colo. 1987). This immunity feature is unique to section 18-1-704.5 : nowhere else in the physical-force affirmative defenses did the legislature provide immunity from prosecution. And, if a pretrial motion to dismiss on grounds of immunity under section 18-1-704.5 fails, the defendant gets a second bite at the apple: he may raise at trial, as an affirmative defense, the conditions set forth in subsection (2). Id. at 981. ¶21 A defendant seeking the benefit of immunity under the force-against-intruders statute bears the burden of establishing, by a preponderance of the evidence, the conditions in subsection (2): (1) the defendant was an occupant of a dwelling; (2) another person made a knowingly unlawful entry into that dwelling; (3) the defendant had a reasonable belief that, in addition to the uninvited entry, the other person had committed, was committing, or intended to commit a crime against a person or property in the dwelling; and (4) the defendant reasonably believed that the other person might use any physical force (no matter how slight) against any occupant of the dwelling.6 Id. at 980–81 ; COLJI-Crim. H:15 (2021). Only the first of these conditions is before us today. The question we confront is whether Rau was in a dwelling when he shot D.R.
¶22 Section 18-1-901 defines certain terms used in Title 18. One of those terms is "dwelling," which is a "building ... used, intended to be used, or usually used by a person for habitation."7 § 18-1-901(3)(g). Importantly, the General Assembly has instructed us to apply this definition "wherever the same term is used in the same sense" in Title 18 "unless the definition is specifically limited or the context indicates that it is inapplicable." § 18-1-901(1). Although we have not had occasion to determine what constitutes a "dwelling" in the force-against-intruders statute, we are not in uncharted waters.8 Before proceeding, we retrace our jurisprudence on the meaning of "dwelling."
B. Dwelling
¶23 We applied the statutory definition of "dwelling" in Jiminez, albeit before the promulgation of the force-against-intruders statute. There, the People charged Jiminez, a juvenile, in district court with burglary of a dwelling, a class 3 felony, after he allegedly unlawfully entered a house's open garage, took a bicycle, and rode off. Jiminez, 651 P.2d at 396. At the end of the preliminary hearing, the district court determined that the People had failed to establish that the garage was part of a dwelling within the meaning of the burglary statute, which meant that the charged burglary was a class 4 felony (not a class 3 felony) and, correspondingly, that the juvenile court had sole jurisdiction over the case. Id. The district court thus dismissed the charge with leave to refile in juvenile court. Id.
¶24 The People appealed, and we reversed. Id. at 395. Focusing on the definition of dwelling in section 18-1-901(3)(g), we reasoned:
The statutory definition of dwelling comprehends an entire building. There is no room in the language of that clearly worded statute to exclude from the meaning of dwelling those parts of a residence that are not "usually used by a person for habitation." Moreover, at least some of the usual uses of a residential garage, including storage of household items, are incidental to and part of the habitation uses of the residence itself. Id. at 396. Hence, under section 18-1-901(3)(g), "dwelling" encompasses even "those parts of a residence that are not usually used by a person directly for habitation, including an open garage." People v. Young, 825 P.2d 1004, 1010 (Colo. App. 1991) (Jones, J., concurring in part and dissenting in part) (discussing Jiminez ’s application of the statutory definition of "dwelling").
C. Application ¶25 In applying the statutory definition of "dwelling," we see no meaningful difference between the garage in Jiminez and the basement in this case. Each was part of a building that was "used, intended to be used, or usually used by a person for habitation." § 18-1-901(3)(g) ; Jiminez , 651 P.2d at 396. Just as the garage in Jiminez was part of the building that was used for habitation, the basement here was part of the building that Rau used for habitation. Additionally, just as some of the usual uses of the garage in Jiminez (including the storage of household items) were incidental to and part of the habitation uses of the residence itself, some of the usual uses of the basement in this case (including the control of the water and heat supply and the storage of household items) were likewise incidental to and part of the use of Rau's residence. As such, much like the garage in Jiminez was part of a dwelling, Rau's basement was part of a dwelling.
¶26 The People argue that the definition of "dwelling" in section 18-1-901(3)(g) is inapposite. The context in which the term appears in section 18-1-704.5(2), contend the People, indicates that the definition is inapplicable to any common areas of apartment buildings. But we see nothing in the context in which "dwelling" is used in section 18-1-704.5(2) to convince us that the definition has no application here.
¶27 We are not persuaded otherwise by the decision in Cushinberry. In that case, the defendant shot and killed the victim in a stairwell landing of an apartment building. Cushinberry , 855 P.2d at 19. In a brief opinion lacking detailed analysis, a division of the court of appeals concluded that the defendant was not entitled to an affirmative defense instruction pursuant to section 18-1-704.5 because the stairwell "was not part of the defendant's apartment" and was instead "a common area used by other tenants and their guests." Id. But the division didn't explain why the common areas of the apartment building did not come within the definition of "dwelling" in section 18-1-901(3)(g). Id. Rather, the division summarily determined that the statutory definition didn't include common areas of apartment buildings. Id. Notably, the division didn't cite, let alone discuss, our decision in Jiminez. Regardless, we're not bound by Cushinberry and, to the extent it is inconsistent with this opinion, it is now overruled.
¶28 The People latch onto the fact that the legislature hasn't amended the definition of "dwelling" in section 18-1-901(3)(g) since Cushinberry was announced. According to the People, this must mean that the legislature agrees with the analysis in Cushinberry. The People read too much into legislative silence. As we've observed before, "of the many sources we may consult to discern legislative intent, reliance on legislative inaction is particularly risky" because the reasons for not enacting legislation "are too numerous to tally." Welby Gardens v. Adams Cnty. Bd. of Equalization, 71 P.3d 992, 998 n.8 (Colo. 2003) (quoted with approval in People v. Jones, 2020 CO 45, ¶ 63, 464 P.3d 735, 747, where we declined the People's invitation to infer legislative intent from the fact that the legislature had not amended the definition of "child" or "person" in the child abuse statute following a particular court of appeals decision, despite having amended the statute several times during that timeframe). Inasmuch as our court has never interpreted the term "dwelling" in the force-against-intruders statute, we do not find such legislative inaction instructive. See Jones, ¶ 65, 464 P.3d at 747. Drawing inferences from legislative silence in the circumstances before us is fraught with peril because it invites us to speculate.
¶29 The People nevertheless insist that two of the trespass statutes reflect the legislature's intent to exclude the common areas of apartment buildings from the definition of "dwelling." In our view, however, these statutes offer no lifeline to the People.
¶30 Under section 18-4-502, C.R.S. (2021), a person commits first degree criminal trespass, a class 5 felony, "if such person knowingly and unlawfully enters or remains in a dwelling of another." (Emphasis added.) But under section 18-4-503(1)(b), C.R.S. (2021), a person commits second degree criminal trespass, a class 3 misdemeanor, if such person "[k]nowingly and unlawfully enters or remains in or upon the common areas of a hotel, motel, condominium, or apartment building." (Emphasis added.) The People posit that the legislature's distinction in these two statutes between a dwelling and the common areas of apartment buildings demonstrates its intent to exclude the common areas of apartment buildings from the definition of "dwelling."
¶31 The People are right—but only in the context of the quoted criminal trespass statutes. "Dwelling" in the first degree criminal trespass statute doesn't include the common areas of hotels, motels, condominiums, or apartment buildings. If someone trespasses any such common area, then the second degree criminal trespass statute, not the first degree criminal trespass statute, applies. Still, the criminal trespass statutes under inspection in no way support the People's position here. To the contrary, they directly undercut it. The criminal trespass statutes the People dangle as grounds for reversal showcase precisely the type of "context" that renders the definition of dwelling in section 18-1-901(3)(g) inapplicable. See § 18-1-901(1) (stating that each definition set forth there, including for "dwelling," applies throughout Title 18 "unless ... the context indicates that it is inapplicable"). Such context is nowhere to be found in section 18-1-704.5. Had the legislature intended to exclude the common areas of apartment buildings from the term "dwelling" in section 18-1-704.5, it presumably would have followed the blueprint of the two criminal trespass statutes discussed.
¶32 Finally, the People maintain that affirming the division's judgment will lead to absurd results because the immunity afforded by section 18-1-704.5 "would extend to every nook and cranny" in apartment buildings, including all the common areas over which tenants and their guests have shared control, such as elevators, parking garages, clubhouses, and laundry and mail rooms. And, add the People, such immunity could presumably also extend to spaces over which tenants are meant to have no control, including those limited to landlords and their staff (e.g., storage rooms and business offices), unoccupied apartments, and even apartments occupied by other tenants.
¶33 We recognize that shared living arrangements introduce an interesting dynamic into the dwelling inquiry. Indeed, if the home in question had not been divided into separate units and Rau and his girlfriend had been its sole occupants, we doubt that anyone would have disputed that the basement was part of his dwelling.9 ¶34 In 1985, when section 18-1-704.5 came into being, the legislature may not have foreseen the types of shared living arrangements that have become conventional in 2022. To be sure, times have changed. But we have no authority to redraft section 18-1-704.5 in an attempt to contemporize it. It is for the legislature, not our court, to rewrite a statute. See Blount v. Rizzi, 400 U.S. 410, 419, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971). Even if we were authorized to revise statutory provisions, our court is ill-equipped to make the types of policy decisions implicated in redefining "dwelling" for purposes of section 18-1-704.5. For example, we discussed with counsel during oral argument the possible wisdom of considering any common area of an apartment building (and of any shared living arrangement) to be part of a dwelling only when the general public is excluded from it and the occupant in question uses it (directly or indirectly) for habitation. But would that avert all possible absurd results? Would it properly cover all shared living arrangements? And would it have any unintended consequences for people in certain types of shared living arrangements?
¶35 Rather than play legislators, we exercise restraint and limit our decision to the narrow situation in this case. To the extent that the definition of "dwelling" in section 18-1-901(3)(g) is outdated or otherwise problematic when applied in the context of section 18-1-704.5, legislative repair—not judicial gloss—is required.
¶36 Thus, today we simply conclude that, under section 18-1-704.5, the basement in the house where Rau and his girlfriend rented an apartment was part of his dwelling when he shot D.R. We decide nothing more and nothing less.10 IV. Conclusion
¶37 For the foregoing reasons, we affirm the division's judgment. Rau was in his dwelling when he shot D.R.
1 The statute is not unique to Colorado. See Wilbanks, supra, at 26-27. Many jurisdictions have similar statutes. Jay M. Zitter, Annotation, Construction and Application of "Make My Day" and "Stand Your Ground" Statutes, 76 A.L.R. 6th 1 (2012). And Colorado wasn't the first state to adopt such a statute—in fact, California had enacted a more permissive version of it ("Home Protection Bill of Rights") the previous year (in 1984). See Wilbanks, supra, at 30.
2 While the home had been chopped into multiple residential units, it retained some of the vestiges of a single-family home.
3 The landlord often relied on Rau and another tenant to check on problems related to the water and heat supply. In exchange, Rau and the other tenant received discounted rent.
4 The specific question on which we granted certiorari is:
Whether the court of appeals erred by declining to follow the decision in People v. Cushinberry, 855 P.2d 18 (Colo. App. 1992), and holding that the basement in question was a "dwelling" for purposes of the "make-my-day" statute, section 18-1-704.5, C.R.S. (2020).
5 Section 18-1-704.5(4) also provides immunity from "civil liability for injuries or death" for the use of force (including deadly physical force) under the conditions listed in subsection (2).
6 Although the force-against-intruders statute doesn't contain a mens rea, "the ‘knowingly’ mens rea is required to carry out the principles of self-defense." McNeese, 892 P.2d at 309. After all, the statute "is not a license to commit homicide." Id.
7 "Building," as used in the statutory definition of "dwelling," refers to "a structure which has the capacity to contain, and is designed for the shelter of, man, animals, or property, and includes a ... place adapted for overnight accommodations of persons or animals, or for carrying on of business therein, whether or not a person or animal is actually present." § 18-4-101(1), C.R.S. (2021); Armintrout v. People, 864 P.2d 576, 581 n.7 (Colo. 1993).
8 Consistent with the mandate in section 18-1-901(1), the court of appeals has always turned to the definition in section 18-1-901(3)(g) when construing "dwelling" in section 18-1-704.5. See Rau, ¶ 15, 490 P.3d at 808 ; Alaniz, ¶ 24, 409 P.3d at 513.
9 This opinion should not be understood as establishing that all common areas in shared living arrangements come within the scope of the term "dwelling" in the force-against-intruders statute. The question before us is much narrower and, accordingly, so is our holding.
10 We pass no judgment on the district court's determination that Rau demonstrated by a preponderance of the evidence that he reasonably believed both that D.R. might use physical force against him and that D.R. had committed or intended to commit a crime in the dwelling (in addition to the uninvited entry).