21CA1108 Peo v Pettigrew 05-08-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1108
Lincoln County District Court No. 16CR105
Honorable Darren L. Vahle, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

William Scott Pettigrew,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Johnson and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 8, 2025

---

Philip J. Weiser, Attorney General, Brock J. Swanson, First Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, James S. Hardy, Lead Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     William Scott Pettigrew appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree murder (after deliberation) and possession of contraband.  Pettigrew raises seven contentions on appeal.  He presents two challenges to the timeliness of his trial; he argues that the statute precluding inmates from asserting a force-against-intruders defense is unconstitutional; he asserts that the trial court made three errors during his trial; and he argues that, even if none of the errors is individually reversible, the cumulative effect of the errors requires reversal.  We affirm.

## I.     Background

¶ 2     The jury could reasonably have found the following facts from the evidence introduced at trial.

¶ 3     In September 2016, Pettigrew was incarcerated at the Limon Correctional Facility (the facility).  The victim was also incarcerated at the facility.

¶ 4     On the day of the incident, the victim stepped inside Pettigrew's cell.  For the first few minutes of their interaction, Pettigrew's cell door was left ajar.  At some point during their

interaction, however, one of them closed the cell door, causing it to lock automatically.

¶ 5     An altercation ensued.  Guards saw the victim, injured and bloodied, pounding on the cell door.  They locked down the pod in which Pettigrew's cell was located, opened the cell door, and separated Pettigrew from the victim.  But Pettigrew had already repeatedly stabbed the victim.  First responders pronounced the victim dead at the scene.  Pettigrew was largely uninjured.  Officers never recovered the murder weapon.

¶ 6     Pettigrew was charged with first degree murder, second degree murder, possession of contraband, and seven habitual criminal counts.

¶ 7     Due to delays that we discuss in more detail below, Pettigrew's trial did not begin until June 2021, nearly five years after the incident.  At trial, the prosecution's theory was that the victim, a Black man, informed officials that members of 211, a white supremacy gang, possessed shanks, resulting in the 211 members' placement in restrictive housing.  The prosecution presented testimony that Pettigrew was a member of 211 and, at the direction of 211's leaders, planned to kill the victim in revenge.  According to

the prosecution's theory, on the day of the incident, Pettigrew "lured" the victim into his cell under the guise that they would snort antidepressants together and "bury the hatchet." The prosecution asserted, however, that Pettigrew actually intended to kill the victim.

¶ 8    Pettigrew represented himself at trial. His theory of defense was that the victim was the initial aggressor and that he acted in self-defense. Alternatively, Pettigrew argued that, because there was no evidence that he "lured" the victim into his cell, his actions constituted, at most, second degree murder.

¶ 9    A jury convicted Pettigrew of first degree murder and possession of contraband. The court dismissed the second degree murder count as a "duplicative" lesser included charge. Because Pettigrew's conviction carried a mandatory life sentence, the prosecution dropped the habitual criminal counts. The court imposed a life sentence without the possibility of parole.

## II.    Timeliness of Trial

¶ 10    Pettigrew first contends that by failing to timely bring him to trial, the court violated the Uniform Mandatory Disposition of Detainers Act (UMDDA), §§ 16-14-101 to -108, C.R.S. 2024, and

3

Pettigrew's statutory and constitutional speedy trial rights. We disagree.

### A. Additional Background

¶ 11 Pettigrew was arraigned in September 2018, after the defense sought multiple continuances. Following his arraignment, Pettigrew, through counsel, waived speedy trial after the defense received additional discovery in response to a subpoena duces tecum. Pettigrew then requested, and was granted, permission to represent himself, which complicated discovery and further delayed his trial. The court appointed advisory counsel for him.

¶ 12 In October 2019, Pettigrew filed a request under the UMDDA for final disposition of his untried criminal complaint. Although the filing was addressed to the Office of the District Attorney in Lincoln County, it contained a file stamp showing that it was filed in the Lincoln County combined courts. The record does not indicate whether a copy of Pettigrew's request was also mailed to the district attorney's office.

¶ 13 After delays throughout 2019, the court set a trial date for May 18, 2020. In April 2020, near the beginning of the COVID-19 pandemic, the court conducted a trial readiness conference with the

parties. At the conference, the court noted that Pettigrew's trial was scheduled for May 18, that his speedy trial deadline would not run until July 22, and that the pandemic presented numerous barriers to holding a jury trial. It rescheduled Pettigrew's trial for July 20, 2020, which was within the speedy trial period.

¶ 14 At a status conference in July 2020, the court made findings regarding the ongoing challenges caused by the pandemic and continued Pettigrew's trial to November. Because Pettigrew did not waive his speedy trial rights, the court ruled that "exceptional circumstances" justified tolling his speedy trial deadline by six months, pursuant to section 18-1-405(6)(g)(II), C.R.S. 2024.

¶ 15 Pettigrew moved to have his trial transferred to a larger county within the same judicial district because it would be "safer to conduct" a trial in a county with a larger population than Lincoln County. At a September 2020 status conference, the court denied the motion, noting that under the controlling Chief Judge order addressing trials during the pandemic, a jury pool of the size required for Pettigrew's trial could not be safely assembled *anywhere* in the district. The court declared a mistrial under Crim. P. 24(c)(4) as to the November trial setting. The court tolled

Pettigrew's speedy trial deadline by three months, to January 29, 2021, pursuant to section 18-1-405(6)(e), and set his trial for January 19.

¶ 16    Before the January 2021 trial, Pettigrew asked for a continuance, explaining that, as a result of his transfer to a different facility and the ongoing COVID-19 restrictions, he was unable to access media files in the discovery provided to him or confer with his advisory counsel by telephone. Pettigrew waived his speedy trial rights, and the court continued the trial for six months — until June 2021.

¶ 17    In May 2021, Pettigrew again asked for a continuance, citing "outstanding discovery issues, new and old." The court denied the motion because of the age of the case and because "routine trial preparation matters" will arise regardless of how many times a trial is reset.

¶ 18    On the morning of the first day of trial, Pettigrew moved to dismiss for violation of his speedy trial rights. The court denied the motion to dismiss, finding that the COVID-19 pandemic was an "appropriate" ground to continue the case and that the subsequent continuance was at Pettigrew's request.

¶ 19    Pettigrew did not invoke his UMDDA rights during any of the pretrial hearings.

## B.    UMDDA

¶ 20    Pettigrew contends that the district court lost jurisdiction under the UMDDA because it did not bring him to trial within the UMDDA's mandated time period.  He is mistaken.

### 1.    Applicable Law and Standard of Review

¶ 21    Under the UMDDA,

> [a]ny person who is in the custody of the department of corrections . . . may request final disposition of any untried . . . criminal complaint pending against him in this state. The request shall be in writing addressed to the court in which the . . . criminal complaint is pending and to the prosecuting official charged with the duty of prosecuting it and shall set forth the place of confinement.

§ 16-14-102(1), C.R.S. 2024.

¶ 22    Section 16-14-103(1), C.R.S. 2024, provides that an inmate's request "made pursuant to section 16-14-102 shall be delivered to the superintendent where the prisoner is confined[,] who shall forthwith" send a copy of the request "to both the court having jurisdiction of the untried offense and to the prosecuting official charged with the duty of prosecuting the offense."

7

§ 16-14-103(1)(b). Although the UMDDA requires that inmates direct their requests to the court and the prosecution, it does not contemplate that inmates send their requests to those parties directly. *People v. McKimmy*, 2014 CO 76, ¶ 23, 338 P.3d 333, 339. Rather, the superintendent must send such requests to the court and the prosecution. *Id.* The UMDDA's requirements are subject to a "strict compliance" standard. *Id.*

¶ 23 Even if an inmate's request to invoke the UMDDA does not strictly comply with the statutory requirements, the request can nevertheless be sufficient if it (1) "substantially complies with the [UMDDA's] requirements," and (2) "the prosecution receives 'actual notice' of the request." *Id.* at ¶ 24, 338 P.3d at 339. An inmate's request substantially complies with the UMDDA if, for example, the request expressly seeks protection under the UMDDA and accurately cites the statute. *See id.*

¶ 24 Once an inmate properly invokes his rights under the UMDDA, the "criminal complaint shall be brought to trial" within 182 days. § 16-14-104(1), C.R.S. 2024. If the trial does not occur within that period, "no court of this state shall any longer have jurisdiction" over the charge, and "the court shall dismiss it with prejudice." *Id.*

8

¶ 25    Significantly, however, "if a continuance is granted for good cause, the [statutory] period is effectively tolled for the length of the continuance." *People v. Fleming*, 900 P.2d 19, 23 (Colo. 1995); *see* § 16-14-104(1).  Additionally, "the parties may stipulate for a continuance or a continuance may be granted on notice to the [inmate's] attorney and opportunity to be heard." § 16-14-104(1). The statutory period may be tolled without the defendant's personal consent.  *Fleming*, 900 P.2d at 23.  Thus, despite a defendant's lack of consent, a continuance granted for good cause will nonetheless toll the 182-day period.  *Id.*

¶ 26    "We review de novo the district court's denial of a motion to dismiss for violation of the UMDDA, but we review for an abuse of discretion the district court's decision to grant a continuance for good cause." *People v. Hines*, 2021 COA 45, ¶ 17, 491 P.3d 578, 583 (citation omitted).  "A district court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *Id.* at ¶ 21, 491 P.3d at 584.

## 2. The Court Did Not Lose Jurisdiction Because Each Continuance Was for Good Cause

¶ 27 Pettigrew argues that he invoked the UMDDA's protections by strictly complying with its requirements. Because he was not tried within the 182-day period after he filed his request, he contends that the court lost jurisdiction over his case. The People contest whether the prosecution received actual notice of the request, especially considering Pettigrew's failure to assert the right at any of the numerous hearings at which the parties and the court discussed the timeliness of Pettigrew's trial. *Compare People v. Campbell*, 742 P.2d 302, 310 (Colo. 1987) ("Although the defendant did not mail a copy of his request to the district attorney's office, the court provided the prosecutor with actual notice of the defendant's letter by mailing a copy to his office."), *with People v. Trancoso*, 776 P.2d 374, 380-81 (Colo. 1989) (holding that an inmate's rights under the UMDDA "cannot be defeated" by a superintendent's failure to forward an inmate's request to the court and prosecution).

¶ 28 Because we conclude that Pettigrew's UMDDA claim would fail regardless of whether he perfected his request, we decline to decide whether Pettigrew's filing was sufficient to give the prosecution

10

actual notice of his UMDDA request. *See Hines*, ¶ 19, 491 P.3d at 584 (declining to decide whether a party properly invoked the UMDDA where the issue of good cause to grant a continuance was dispositive).

¶ 29 We conclude that Pettigrew's UMDDA claim fails because the UMDDA's deadline is "tolled for the length" of a continuance granted for good cause, and because the court continued the trial for good cause each time Pettigrew requested a continuance (or he agreed to one). *Fleming*, 900 P.2d at 23; § 16-14-104(1).

¶ 30 Assuming, without deciding, that Pettigrew perfected a request in October 2019, the UMDDA's deadline would have run in April 2020. The continuances that the court granted beyond that date were either at Pettigrew's request or attributable to the impact of the COVID-19 pandemic on trial settings. Thus, the continuances were for "good cause." § 16-14-104(1); *see also People v. Shreck*, 107 P.3d 1048, 1056 (Colo. App. 2004) ("'[A] defendant may waive his or her right to a speedy trial under the UMDDA expressly or by affirmative conduct, such as by participating in setting the trial date outside of the speedy trial provisions' or expressly consenting to the delay." (quoting *People v. Garcia*, 17 P.3d 820, 823 (Colo.

11

App. 2000))); *People v. Sherwood*, 2021 CO 61, ¶¶ 31, 36, 489 P.3d 1233, 1240-41 (upholding a court's continuance of a trial because the court could not safely assemble a fair jury pool because of the COVID-19 pandemic).

### C.     Speedy Trial

¶ 31     Pettigrew next asserts that the court's failure to timely bring him to trial violated his statutory and constitutional speedy trial rights.  Pettigrew contends that the Colorado Supreme Court's adoption of Crim. P. 24(c)(4) violated the separation of powers doctrine and that his request for a continuance in January 2021 was compelled due to the prosecution's and the Department of Corrections' bad faith.

### 1.     Applicable Law and Standard of Review

¶ 32     Colorado's speedy trial statute provides that, if a defendant's case "is not brought to trial . . . within six months from the date of the entry of a plea of not guilty, . . . the pending charges shall be dismissed" with prejudice unless the statute provides otherwise. § 18-1-405(1); *see Sherwood*, ¶ 21, 489 P.3d at 1238-39.  "The burden of compliance with the speedy trial requirement . . . rests

wholly with the [prosecution] and the trial court." *Sherwood*, ¶ 23,
489 P.3d at 1239.

¶ 33    The statute excludes certain time periods from the calculation
of the six-month speedy trial deadline, including, as relevant here,
the "period of delay caused by any mistrial, not to exceed three
months for each mistrial." § 18-1-405(6)(e).  A trial court may
declare a mistrial for several reasons, including if "a fair jury pool
cannot be safely assembled in that particular case due to a public
health crisis or limitations brought about by such crisis."  Crim. P.
24(c)(4).  The declaration "must be supported by specific findings."
*Id.*  (The Colorado Supreme Court added paragraph (c)(4) to Crim. P.
24 in April 2020 "amid the societal disruptions caused by the global
COVID-19 pandemic." *People v. Burdette*, 2024 COA 38, ¶ 30, 552
P.3d 1108, 1116.)

¶ 34    The decision to declare a mistrial under Crim. P. 24(c)(4) is
within the sound discretion of the trial court, which is better
positioned than is a reviewing court to determine whether "a fair
jury pool" can be "safely assembled" due to "a public health crisis or
limitations brought about by such crisis."  Crim. P. 24(c)(4); *see*
*People v. Eason*, 2022 COA 54, ¶ 29, 516 P.3d 546, 554.  But the

speedy trial statute "leaves no discretion for the trial court to make exceptions to the six-month rule beyond those specifically enumerated." *People v. DeGreat*, 2020 CO 25, ¶ 13, 461 P.3d 11, 15. Whether a trial date violates a defendant's speedy trial rights is a question of law that we review de novo. *See id.* at ¶ 12, 461 P.3d at 14; *Sherwood*, ¶ 19, 489 P.3d at 1238.

¶ 35    The People contest whether Pettigrew preserved the specific contentions that he now raises on appeal. Although we agree that Pettigrew generally asserted his speedy trial rights in the trial court, he did not alert the court to his separation of powers or bad faith arguments. *See People v. Cooley*, 2020 COA 101, ¶ 24, 469 P.3d 1219, 1224 ("An objection is sufficiently specific when it draws the court's attention to the asserted error."). Thus, if we conclude that the court erred, we will only reverse if that error was plain. *See Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120. For the same reason, we need not conduct a plain error analysis if we conclude the court did not err. *See People v. Jacobson*, 2017 COA 92, ¶ 23, 474 P.3d 1222, 1227.

## 2. The Supreme Court Did Not Violate the Separation of Powers Doctrine by Amending Crim. P. 24(c)

¶ 36    Pettigrew first claims that the supreme court's adoption of Crim. P. 24(c)(4) violated the separation of powers doctrine because it usurped the General Assembly's authority to establish the substantive rules pertaining to mistrials.  He argues that the supreme court exceeded its power to promulgate procedural rules because Crim. P. 24(c)(4) "materially broadened the definition of mistrial and expanded the time excluded from the speedy trial calculation — which only the legislature can do."

¶ 37    In *Eason,* ¶ 21, 516 P.3d at 552, which was announced after Pettigrew's trial, a division of this court concluded that Crim. P. 24(c)(4) is a procedural rule that does not violate the separation of powers doctrine.  The division explained that, even if "some aspect of public policy" underlies the rule, "it [does not] conflict with any legislative (or executive) expression of public policy and is therefore lawful." *Id.*

¶ 38    In *Burdette,* ¶ 34, 552 P.3d at 1117, another division — in considering the same argument that Pettigrew asserts in this case — concluded that the trial court did not plainly err because any

15

error was not obvious. The division noted that, "[a]t the time of the mistrials, no clear statutory command, settled legal principle, or Colorado case law suggested Crim. P. 24(c)(4) violated the separation of powers doctrine." *Id.* "To the contrary," the division said, "shortly before trial in this case, the General Assembly approved legislation that bolstered Crim. P. 24(c)(4)'s objective by authorizing trial courts to exclude an additional period from the speedy trial calculation to account for any 'restriction, procedure, or protocol' related to the COVID-19 pandemic." *Id.* (quoting Ch. 277, sec. 1, § 18-1-405, 2021 Colo. Sess. Laws 1600).

¶ 39 We agree with the *Burdette* division that a court does not obviously err by failing to "declare Crim. P. 24(c)(4) unconstitutional on its own motion," when prevailing guidance from the General Assembly at the time of the mistrials was "largely consistent with Crim. P. 24(c)(4), not in conflict with it." *Id.*

### 3. The Court Did Not Violate Pettigrew's Constitutional Speedy Trial Right

¶ 40 Pettigrew also contends that, by granting his own request for a continuance in January 2021, the court violated his constitutional speedy trial rights pursuant to *Barker v. Wingo*, 407 U.S. 514, 530-

16

33 (1972). "A defendant has a constitutional speedy trial right under the United States Constitution's Sixth Amendment and article II, section 16 of the Colorado Constitution." *People v. Jompp*, 2018 COA 128, ¶ 28, 440 P.3d 1166, 1173. We apply the factors set out in *Barker* when assessing whether a court violated a defendant's constitutional right to a speedy trial. *See People v. Chavez*, 779 P.2d 375, 376 (Colo. 1989). These factors are (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530.

¶ 41     First, a delay is "'presumptively prejudicial,' as it approaches one year." *People v. Cox*, 2023 COA 1, ¶ 44, 528 P.3d 204, 214 (quoting *People v. Sandoval-Candelaria*, 2014 CO 21, ¶ 36, 321 P.3d 487, 493). Pettigrew's case did not go to trial for nearly five years after the prosecution filed charges against him. This delay meets the "presumptively prejudicial" criterion. Because the delay exceeded one year, this factor weighs in favor of finding a speedy trial violation and requires us to analyze the remaining three *Barker* factors.

¶ 42    Second, "delay caused by the defense weighs against the defendant." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009); *see People v. Jamerson*, 596 P.2d 764, 768 (1979). As a consequence of the impact of the COVID-19 pandemic on trial settings, the court deferred Pettigrew's trial date by approximately eight months, and the speedy trial deadline was tolled during that time. We conclude that the pandemic was a justifiable reason for this delay. *See Sherwood*, ¶¶ 31, 36, 489 P.3d at 1240-41 (upholding a court's continuance of a trial because it could not safely assemble a fair jury pool because of COVID-19).

¶ 43    Pettigrew requested the January 2021 continuance because, under controlling Department of Corrections restrictions to limit the spread of COVID-19, he was unable to access the law library to view videos that the prosecution produced in discovery. Although Pettigrew did not cause his own inability to view the videos, the condition was not the result of the prosecution's or the Department of Corrections' bad faith. *See People v. Duncan*, 31 P.3d 874, 877 (Colo. 2001) ("This court has long held that in the absence of a showing of bad faith on the part of the prosecutor, such as a last minute ploy to circumvent the requirements of the speedy trial

18

provisions, a defendant's tactical decision to seek a continuance is chargeable to him."). To the extent that Pettigrew claims the delay was caused by the prosecution's late disclosure of discovery materials, we conclude that the record largely refutes that argument. At a December 2020 hearing, the prosecutor explained that, while he provided Pettigrew with additional discovery files on disc, those discs merely contained a reorganized version of discovery materials previously produced to Pettigrew, in accordance with one of the court's discovery orders.

¶ 44 Third, the only time that Pettigrew asserted his speedy trial right was when the court continued his trial for reasons relating to the COVID-19 pandemic. The court granted all the other continuances throughout the case — including the January 2021 continuance that Pettigrew challenges on appeal — at his own request. Indeed, Pettigrew explicitly waived his speedy trial right when he asked for the January 2021 continuance. This factor weighs against a finding of a speedy trial violation.

¶ 45 Fourth, the court — while obviously concerned about the delays and eager to set a trial date — found that Pettigrew was not prejudiced by the delays because he was already in the custody of

19

the Department of Corrections. The record supports that finding. Thus, this factor also weighs against a finding of a speedy trial violation.

¶ 46 Although the delay of Pettigrew's trial was presumptively prejudicial, the third and fourth factors weigh against a finding of a speedy trial violation, and the second factor is neutral because the challenged delays were primarily attributable to the consequences of the COVID-19 pandemic — which were outside the control of the court, the parties, and the Department of Corrections.

¶ 47 For these reasons, we conclude that Pettigrew failed to establish a constitutional speedy trial violation.

## III. Force-Against-Intruders Statute

¶ 48 In Colorado, a person has a right to use deadly force to defend himself when he reasonably believes that he is in imminent danger of being killed or sustaining serious bodily injury and reasonably believes that a lesser degree of force is inadequate. § 18-1-704(1), (2), C.R.S. 2024; *see People v. Martinez*, 2022 COA 111, ¶ 15, 522 P.3d 725, 729, *aff'd*, 2024 CO 48, 550 P.3d 713.

¶ 49 Colorado's force-against-intruders statute, § 18-1-704.5, C.R.S. 2024, expands the right to self-defense in cases involving an

intruder's knowing unlawful entry into a home. *Martinez*, ¶ 16, 522 P.3d at 729.

¶ 50 The force-against-intruders statute provides that an "occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person" when (1) "that other person has made an unlawful entry into the dwelling"; (2) "the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry"; and (3) "the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant." § 18-1-704.5(2).

¶ 51 The force-against-intruders statute "provides immunity from criminal prosecution"; it "bars criminal proceedings against a person who uses force (including deadly physical force) under the conditions listed in subsection (2)." *People v. Rau,* 2022 CO 3, ¶ 20, 501 P.3d 803, 810 (citing *People v. Guenther*, 740 P.2d 971, 975 (Colo. 1987)). A defendant who does not obtain immunity from

21

prosecution may nonetheless assert the statute as an affirmative defense at trial. *Id.*

¶ 52 "Colorado courts have broadly interpreted the term 'dwelling' . . . ." *People v. Alaniz*, 2016 COA 101, ¶ 25, 409 P.3d 508, 513. In 2016, a division of this court held that a prison cell is a "dwelling" within the meaning of the force-against-intruders statute, *id.* at ¶¶ 28-29, 409 P.3d at 514, but noted that "[t]he General Assembly is free to amend the statute," *id.* at ¶ 36, 409 P.3d at 515.

¶ 53 The same year, the General Assembly narrowed the definition of "dwelling" in the force-against-intruders statute by providing that, "unless the context otherwise requires, 'dwelling' does not include any place of habitation in a detention facility" (the detention facility exception). Ch. 87, sec. 1, § 18-1-704.5(5), 2016 Colo. Sess. Laws 245.

¶ 54 Before trial, Pettigrew filed a motion for a declaration that the detention facility exception is unconstitutional. The court denied the motion. Pettigrew reasserted his constitutionality arguments in a C.A.R. 21 petition to the Colorado Supreme Court, which denied the petition.

22

¶ 55     Pursuant to the detention facility exception, the court did not permit Pettigrew to assert the force-against-intruders statute as grounds for immunity or as an affirmative defense at trial.

¶ 56     On appeal, Pettigrew argues that the detention facility exception (1) deprives inmates of the fundamental right to self-defense; (2) violates the Equal Protection Clauses of the United States and Colorado Constitutions; and (3) is unconstitutionally vague.

¶ 57     "We review the constitutionality of statutes de novo, beginning with the presumption that the statute is constitutional." *Aurora Pub. Schs. v. A.S.*, 2023 CO 39, ¶ 36, 531 P.3d 1036, 1046.

### A.     The Detention Facility Exception Does Not Violate the Fundamental Right to Self-Defense

¶ 58     Pettigrew contends that the detention facility exception violates his fundamental right to self-defense.  Underlying Pettigrew's contention is the assumption that what he characterizes as the "fundamental right" to self-defense found in the Second Amendment to the United States Constitution and article II, section 3 of the Colorado Constitution is interchangeable with the statutory

right to self-defense embodied in the force-against-intruders statute.

¶ 59    We disagree with this premise. As another division of this court concluded, the force-against-intruders statute is a legislatively crafted *expansion* to the right to self-defense. *See Martinez*, ¶ 16, 522 P.3d at 729. Pettigrew provides no support for his assertion that the right to use deadly force against intruders in the manner envisioned in the force-against-intruders statute is a fundamental right subsumed within the constitutional right to bear arms. Notably, the court permitted Pettigrew to assert a traditional self-defense at trial, although the jury rejected it.

¶ 60    "[W]e review substantive due process claims that [do not] implicate a fundamental right under the rational basis test: the state must 'demonstrate that the legislation bears some reasonable relationship to a legitimate governmental interest.'" *People v. Maloy*, 2020 COA 71, ¶ 52, 465 P.3d 146, 158 (quoting *People v. Young*, 859 P.2d 814, 818 (Colo. 1993)).

¶ 61    The detention facility exception readily survives rational basis review. The state has a legitimate governmental interest in protecting the safety of inmates and detention facility employees

and discouraging the use of violence in detention facilities. Prohibiting inmates from invoking the force-against-intruders statute — an *expansion* to the traditionally recognized defense of self-defense that inmates remain entitled to assert — is reasonably related to the state's legitimate governmental interest in safety and violence prevention because it limits an inmate's use of force to situations where he reasonably perceives the "use or imminent use of unlawful physical force" by another. § 18-1-704.

¶ 62 For these reasons, we conclude that the detention facility exception does not violate Pettigrew's fundamental right to self-defense.

### B. The Detention Facility Exception Does Not Violate Equal Protection

¶ 63 The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *see also* Colo. Const. art. II, § 25.

¶ 64 "Where a party raises an equal protection challenge, the level of judicial scrutiny depends on the type of classification used and the nature of the right affected." *People v. Castillo*, 2022 COA 20,

¶ 19, 510 P.3d 561, 566. As with substantive due process claims that do not implicate a fundamental right, we apply rational basis review when the challenged law does not impact a traditionally suspect class. *See id.*

¶ 65 Pettigrew contends that the detention facility exception violates the constitutional guarantee of equal protection because it treats inmates and similarly situated, non-incarcerated residents of a dwelling differently. Thus, Pettigrew contends he has been treated differently because of his incarceration status. But incarceration is not a suspect classification. *See Curley v. Perry*, 246 F.3d 1278, 1285 n.5 (10th Cir. 2001); *Carson v. Johnson*, 112 F.3d 818, 821-22 (5th Cir. 1997) ("Neither prisoners nor indigents constitute a suspect class.").

¶ 66 Thus, we apply rational basis review to Pettigrew's equal protection claim. For the reasons discussed above, *supra* Part III.A, we conclude that the detention facility exception survives rational basis review.

C. The Detention Facility Exception Is Not Void for Vagueness

¶ 67 Finally, Pettigrew contends that the detention facility exception is unconstitutional because it is impermissibly vague. Specifically,

he challenges the qualifier, "unless the context otherwise requires." § 18-1-704.5(5). Pettigrew asserts that the General Assembly "provided no guidance to give this clause meaningful effect."

¶ 68 A law "violates due process requirements when it contains language so vague that it fails to provide fair notice of what conduct is prohibited." *Sellon v. City of Manitou Springs*, 745 P.2d 229, 233 (Colo. 1987). "A state-imposed sanction violates due process if the underlying law or regulation 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *In re Abrams*, 2021 CO 44, ¶ 23, 488 P.3d 1043, 1052 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "Thus, the vagueness doctrine requires that a criminal statute 'be framed with sufficient clarity to alert all who are subject to its sanctions to the nature of the proscribed behavior and to inform them of permissible standards of conduct, that they may conduct themselves accordingly.'" *McCoy v. People*, 2019 CO 44, ¶ 60, 442 P.3d 379, 392 (quoting *People v. Randall*, 711 P.2d 689, 691 (Colo. 1985)).

¶ 69    But "neither scientific nor mathematical exactitude in legislative draftsmanship" is required. *Sellon*, 745 P.2d at 233. "[A] vagueness challenge fails 'where reasonable persons would know that their conduct puts them at risk.'" *Abrams*, ¶ 24, 488 P.3d at 1052 (quoting *People v. Graves*, 2016 CO 15, ¶ 19, 368 P.3d 317, 325).

¶ 70    "The term 'context' in the statutory phrase 'unless the context otherwise requires' means the context 'within which [a defined statutory term] is used within the statute's substantive provisions.'" *People v. Mendenhall*, 2015 COA 107M, ¶ 25, 363 P.3d 758, 766 (quoting *Pima Fin. Serv. Corp. v. Selby*, 820 P.2d 1124, 1128 (Colo. App. 1991)).

¶ 71    Notwithstanding the qualifier, we conclude that the General Assembly framed the detention facility exception "with sufficient clarity to alert all who are subject" to it to "permissible standards of conduct, that they may conduct themselves accordingly.'" *McCoy*, ¶ 60, 442 P.3d at 392 (quoting *Randall*, 711 P.2d at 691). Specifically, the detention facility exception leaves no question that the protections outlined in the force-against-intruders statute do not apply to inmates. Although the open-ended qualifier may not

28

amount to "mathematical exactitude in legislative draftsmanship," *Sellon*, 745 P.2d at 233, it is not "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Abrams*, ¶ 23, 488 P.3d at 1052 (quoting *Williams*, 553 U.S. at 304). For these reasons, we conclude that the detention facility exception is not constitutionally infirm.

## IV. Trial Issues

¶ 72 Pettigrew next asserts that the court committed three errors during his trial. First, according to Pettigrew, the court admitted a summary exhibit containing inadmissible hearsay and thereby violated his Confrontation Clause rights. Second, he says the court erred by not sua sponte intervening when a witness "narrated" a video exhibit. Third, Pettigrew contends that the court erroneously rejected one of his proposed jury instructions. We address and reject each contention in turn.

### A. Standard of Review

¶ 73 We review a trial court's evidentiary rulings for an abuse of discretion. *Rojas v. People*, 2022 CO 8, ¶ 16, 504 P.3d 296, 302. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *People v.*

*Johnson*, 2021 CO 35, ¶ 16, 486 P.3d 1154, 1158.  However, we review de novo whether a particular statement constitutes hearsay or violates a defendant's rights under the Confrontation Clause. *See People v. Schnorenberg*, 2023 COA 82, ¶ 10, 541 P.3d 1, 4 (*cert. granted* May 28, 2024); *People v. Jones*, 2023 COA 104, ¶ 43, 543 P.3d 419, 427.  "[W]e review the trial court's decision regarding whether to give a particular jury instruction for an abuse of discretion."  *People v. Manyik*, 2016 COA 42, ¶ 65, 383 P.3d 77, 89.

¶ 74     We apply harmless error review to preserved contentions of nonconstitutional dimension, reversing only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings."  *Hagos*, ¶ 12, 288 P.3d at 119 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 75     As noted above, we review unpreserved errors for plain error. *See id.* at ¶ 14, 288 P.3d at 120.

## B.     Summary Exhibit

¶ 76     The prosecutor called a criminal investigator for the Office of the Inspector General, Eugene Redman, to testify about his investigation of the incident.  Redman explained that the facility's surveillance system captures video (but not audio) recordings of

30

common spaces, but that there are no recording devices inside individual cells.

¶ 77    The prosecutor asked Redman to authenticate several exhibits, including segments of a surveillance video from the day of the incident and still photographs captured from the video.  After the court admitted the exhibits, Redman used the still photographs to describe various portions of the facility and the inmates' daily routine.  The prosecutor then directed Redman's attention to the surveillance videos.  Before playing them for the jury, the prosecutor asked Redman questions about Exhibit 22, which he described as "a summary of the times and the events" depicted in the videos.  Exhibit 22 contains five color-coded tables — corresponding to different videos — that describe critical events shown on the videos, together with the corresponding timestamps. Redman confirmed that, based on his review of Exhibit 22 and the surveillance videos, Exhibit 22 was an "accurate summary" of the events shown in the videos.

¶ 78    Pettigrew objected to Exhibit 22's admission on foundation, hearsay, and authentication grounds.  He did not argue that admission of the exhibit would violate his Confrontation Clause

rights, however.  The court admitted Exhibit 22 over Pettigrew's objection.

¶ 79     During closing argument, the prosecutor referenced Exhibit 22 and asked the jury to closely review its timelines.

¶ 80     Pettigrew contends that the court erred by admitting Exhibit 22 because it was hearsay not subject to any exception.  He asserts that Exhibit 22 was hearsay because an "unidentified [Department of Corrections] declarant" created it.  He also asserts, for the first time on appeal, that Exhibit 22 constituted inadmissible testimonial hearsay and that its admission violated his Confrontation Clause rights.  We disagree.

¶ 81     Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person to be communicative."  CRE 801(a).

¶ 82     Rule 1006 of the Colorado Rules of Evidence allows for the admission of summary exhibits.  CRE 1006 provides, "The contents of voluminous writings, recordings, or photographs which cannot

conveniently be examined in court may be presented in the form of a chart, summary, or calculation."

¶ 83    Summary exhibits are generally admissible if (1) the evidence is "sufficiently voluminous such that in-court examination would be inconvenient"; (2) they summarize the underlying information "accurately, correctly, and in a nonmisleading manner"; and (3) the underlying information is "at least admissible, if not admitted." *Murray v. Just in Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 50, 374 P.3d 443, 457 (quoting *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998)); *see also People v. McDonald*, 15 P.3d 788, 790 (Colo. App. 2000).  "[T]he most important considerations in determining whether summary charts are admissible are whether the summaries are sufficiently accurate and nonprejudicial and whether they would be helpful to the jury." *Murray*, ¶ 52, 374 P.3d at 457-58.  "[T]rial courts abuse their discretion when they admit summary charts that characterize evidence in an argumentative fashion rather than simply organize it in a manner helpful to the trier of fact." *Id.* at ¶ 47, 374 P.3d at 456.  (On appeal, Pettigrew does not challenge the admission of the underlying surveillance videos from which the summary charts were prepared.  Nor does he

challenge the admissibility of Exhibit 22 under any of the conditions for admissibility set out in CRE 1006 and *Murray*.)

¶ 84   Witnesses providing summary testimony may satisfy the "personal-knowledge requirement by examining the underlying documentary evidence on which they base[] their testimony." *Id.* at ¶ 61, 374 P.3d at 459; *see also U.S. Welding, Inc. v. B & C Steel, Inc.*, 261 P.3d 513, 517-18 (Colo. App. 2011). Redman testified that he had examined the surveillance videos and the summary charts, and that Exhibit 22 accurately summarized the content of the surveillance video. Exhibit 22 merely organized the information in the videos in a manner helpful to the jury. *See Murray*, ¶ 47, 374 P.3d at 456.

¶ 85   Further, Pettigrew had the opportunity to cross-examine Redman about possible discrepancies between Exhibit 22 and the underlying surveillance videos. The jury had access to the underlying videos and was able to determine if there were any inconsistencies between them and Exhibit 22.

¶ 86   Thus, we do not believe that Exhibit 22 was hearsay. And because it was not hearsay, its admission did not implicate or violate Pettigrew's Confrontation Clause rights. *See People v.*

*Marciano*, 2014 COA 92M-2, ¶ 38, 411 P.3d 831, 839 ("The admission of testimonial hearsay violates a defendant's right to confrontation under the Sixth Amendment of the United States Constitution absent unavailability of the declarant and a prior opportunity for cross-examination by the defendant.").

### C.     Narration of Video Exhibit

¶ 87     Pettigrew next contends the court erred by failing to intervene without the benefit of objection after Redman "narrated" a video exhibit.  We are unpersuaded.

¶ 88     After admitting Exhibit 22, the prosecutor played portions of several of the surveillance videos.  Each exhibit contained a surveillance video from one of the cameras peppered throughout the facility.  Thus, the prosecutor bounced between exhibits to play clips from different surveillance cameras in chronological order.  The prosecutor used Redman's testimony to orient the jury and explain the different clips they were viewing.

¶ 89     As the jury watched the video exhibits, Redman provided the following testimony:

- which of the doors within the pod was the door to Pettigrew's cell;

- details about Pettigrew's and other witnesses' attire;

- the inmates' daily routine and why they would be moving from one portion of the facility to another at a given time;

- whether anything shown on the video would change for a certain period of time; and

- whether Pettigrew's cell door was ajar or closed at a given time.

¶ 90    At one point, Redman admitted that he had previously confused Pettigrew with another man who, like Pettigrew, was wearing a hat and was seated at the same cafeteria table as Pettigrew.  Pettigrew was afforded an opportunity to cross-examine Redman regarding his mistake.  He did not object to Redman's testimony on the basis he asserts on appeal — that Redman allegedly provided improper narrative testimony.

¶ 91    Under CRE 701, a lay witness may testify to opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the

scope of [CRE] 702." Lay opinion testimony is admissible under CRE 701 if "it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a firsthand witness to a particular event." *People v. McFee*, 2016 COA 97, ¶ 76, 412 P.3d 848, 863 (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)). A witness may not testify to conclusions that jurors are "competent to reach on their own," *id.*, because such opinion testimony is not "helpful" to the jury, as CRE 701 requires. *Cf. McFee*, ¶ 76, 412 P.3d at 863 (A witness may not interpret what the defendant said in an audio recording if the jury is in "precisely the same position" as the witness to hear and interpret the defendant's words, and if the witness "was neither present when [the defendant] uttered the words nor so familiar with [the defendant's] voice that he was more likely to correctly identify the contested words" than the jury.).

¶ 92     "[A] lay witness may testify regarding the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *Robinson v.*

37

*People*, 927 P.2d 381, 384 (Colo. 1996). "[T]he lay witness need only be personally familiar with the defendant, and the intimacy level of the witness'[s] familiarity with the defendant goes to the weight to be given to the witness'[s] testimony, not the admissibility of such testimony." *Id.*

¶ 93    For the following reasons, we perceive no error in the court's admission of Redman's testimony. Redman testified that he was familiar with the facility and with Pettigrew, and that he had watched the surveillance videos at length. Thus, he was not in the same position as the jury to explain confusing portions of the surveillance video. Rather, Redman provided a significant amount of testimony that would have been helpful to the jury. For example, he was able to contextualize what the jury was seeing, foreshadow important events that the jurors should watch for, and identify key witnesses in the videos. In some clips, as many as twenty to thirty similarly dressed men were shown simultaneously. Redman's testimony helped the jury pinpoint where Pettigrew and other witnesses were located on the screen and what they were wearing for future identification. Finally, Redman's familiarity with the

videos allowed the prosecutor to skip unimportant sections of the lengthy videos, promoting the efficiency and expediency of the trial.

¶ 94 To the extent that our case law prohibits a witness from interpreting a recording that the jury is similarly situated to interpret, *see McFee*, ¶ 76, 412 P.3d at 863, we conclude that the prohibition does not apply to this case. The videos that Redman described during his testimony contained no audio, and Redman never "narrated" a recorded statement. *See People v. Grant*, 2021 COA 53, ¶ 66, 492 P.3d 345, 354-55 (distinguishing *McFee* from cases involving a witness's identification of a defendant on surveillance video).

¶ 95 Thus, we perceive no error, let alone plain error.

D. Character Evidence Jury Instruction

¶ 96 Finally, Pettigrew contends that the court erroneously rejected one of his proposed jury instructions.

¶ 97 During trial, the court admitted certain of Pettigrew's evidence of the victim's violent character, which Pettigrew said supported his defense of self-defense. During the jury instruction conference, Pettigrew tendered a proposed jury instruction that said, "You may consider evidence of the victim's character for violence when

determining whether the victim would be likely to be the initial aggressor." The court denied the proposed instruction.

¶ 98 "A jury instruction should substantially track the language of the statute describing the crime; a material deviation from the statute can result in reversible plain error, depending on the facts of the case." *People v. Weinreich*, 119 P.3d 1073, 1076 (Colo. 2005). We review not only whether the jury instructions faithfully tracked the law but also whether they were confusing or may have misled the jury. *Garcia v. People*, 2022 CO 6, ¶ 16, 503 P.3d 135, 140.

¶ 99 We conclude that the court did not err by rejecting Pettigrew's proposed instruction because the court had already properly instructed the jury on Pettigrew's defense of self-defense, and the proposed instruction improperly highlighted evidence.

¶ 100 "An instruction that tracks the language of the statute, as this one did, is generally sufficient." *People v. Archuleta*, 2017 COA 9, ¶ 52, 411 P.3d 233, 242. The self-defense instruction that the court provided tracked the language of the self-defense statute and the language of the Colorado Model Criminal Jury Instructions. *See* § 18-1-704; COLJI-Crim. H:12 (2024).

¶ 101 "[A] trial court may refuse an instruction if it is argumentative, unduly emphasizes particular evidence, or contains statements not supported by the evidence." *People v. Vanderpauye*, 2021 COA 121, ¶ 68, 500 P.3d 1146, 1157 (quoting *People v. Baird*, 66 P.3d 183, 194 (Colo. App. 2002)), *aff'd*, 2023 CO 42, 530 P.3d 1214. The proposed instruction was improper because it unduly emphasized evidence suggesting the victim had a violent character and instructed the jury to use that evidence for a specific purpose.

¶ 102 Thus, the court properly rejected the proposed instruction.

## V. Cumulative Error

¶ 103 Pettigrew contends that, if we determine the court erred and that none of the errors individually requires reversal of his conviction, we should nevertheless reverse because of the errors' cumulative prejudicial impact. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not. Stated simply, cumulative error involves cumulative prejudice." *Howard-Walker v. People*, 2019 CO 69, ¶ 25, 443 P.3d 1007, 1011 (citation omitted). The relevant inquiry is "whether, viewed in the aggregate, the errors deprived the

41

defendant of a fair trial." *Id.* at ¶ 40, 443 P.3d at 1014. Because we conclude that the court did not err, we reject Pettigrew's cumulative error argument. (In light of that conclusion, we decline to opine on the People's assertion that we should review unpreserved claims of cumulative error for plain error.)

## VI. Violation of C.A.R. 28(e)

¶ 104 Lastly, we note that, to fit the second amended opening brief within the word limit, Pettigrew's counsel removed spaces from legal citations and citations to the record. We not only granted Pettigrew's counsel leave to file an oversized 10,500-word opening brief, but, in our July 21, 2023, order, we warned counsel that improperly altering the brief's formatting violates our "Policy on Citation to the Record Adopted pursuant to C.A.R. 28(e)" and makes briefs "difficult to read and decipher." Without the improper alterations, the word count in Pettigrew's second amended opening brief exceeded the 10,500-word limit that this court authorized. Having previously advised the Appellate Division of the Colorado State Public Defender's Office that we will not tolerate this practice, we now warn the Office that further manipulation of legal and

record citations to artificially reduce the word count of an already oversized brief may result in the imposition of sanctions.

## VII. Disposition

¶ 105    The judgment is affirmed.

JUDGE JOHNSON and JUDGE MOULTRIE concur.